2020 IL App (1st) 181263-U

FIRST DISTRICT,
SECOND DIVISION
April 7, 2020

No. 1-18-1263

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 13 CR 3179 |
| | ) | |
| CARNELL JONES, | ) | Honorable |
| | ) | Kevin M. Sheehan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Trial record was insufficiently developed to adjudicate defendant's ineffective assistance claim. (2) State's firearm identification expert was not required on direct examination to disclose the facts underlying his opinion. (3) Allowing jury access to unadmitted transcript during deliberations was harmless error because the transcript contained nothing inculpatory. (4) Evidence was sufficient to convict defendant of first-degree murder on a theory of accountability.

¶ 2    Following a shooting incident in a parking lot, defendant Carnell Jones was convicted of

the murder of Javonne Oliphant and the attempted murder of Andre Gladney.  Jones argues that

his conviction must be reversed because (1) his counsel was ineffective for failing to move to

suppress evidence that Jones possessed one of the guns used in the incident; (2) the State lacked a foundation for the opinions of its firearm identification expert and bolstered his conclusion with inadmissible hearsay; (3) the trial court erred by allowing the jury access to a transcript of grand jury testimony introduced only as to Jones' co-defendant Omar Williams; and (4) the evidence was insufficient to prove Jones guilty of Oliphant's murder. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        At around 11:15 p.m. on July 1, 2011, Gladney and Oliphant were shooting dice at a playground near the Abla Homes housing project. Gladney had consumed a cup of tequila and a pill of ecstasy, and he had been smoking marijuana all day. Although he was high, he claimed it did not affect his ability to function. In an adjacent parking lot, he saw a van pull up which he recognized as belonging to Antoine Williams and his "cousin or uncle" Omar Williams.

¶ 5        Gladney gave multiple accounts of what happened next. At trial, he testified that after the dice game ended, he saw Omar and Antoine in the parking lot, but he did not see Jones, whom he knew from the neighborhood since he was a child. Oliphant went to speak with Omar and Antoine, while Gladney remained at the playground doing things on his cell phone. He could hear Oliphant, Omar, and Antoine "going back and forth" as if they were explaining things to each other, but he did not hear any raised voices. Suddenly, while Gladney was still looking at his cell phone, he was shot in the back. He fled on foot. While fleeing, he was shot several more times. He did not see who shot him, nor did he see what happened to Oliphant.

¶ 6        Gladney told a different version of events in a handwritten statement he gave to an assistant State's attorney on September 28, 2011, as well as his grand jury testimony, both of which were introduced as substantive evidence (see 725 ILCS 5/115-10.1 (West 2016)). In his

statement and in his grand jury testimony, he said that he saw Jones with Omar and Antoine in the parking lot. Gladney and Oliphant both went to speak with them, and a verbal argument broke out between Omar and Oliphant. During the argument, Omar walked behind Gladney and grabbed him by the shoulders. When Gladney tried to pull away, Omar shot him in the back. Gladney fell to the ground, and Omar shot him two more times. Oliphant grabbed Omar, and the two of them started tussling. Gladney got up and began running away in the direction of the playground. As he ran, he looked back and saw Omar shoot Oliphant three times. Oliphant fell to the ground, whereupon Omar turned back toward Gladney, pointed his gun at him, and fired "[l]ike three more times." At the same time, Gladney also saw Jones firing a gun at him.

¶ 7        A security guard at Abla Homes, Jason Jones (no apparent relation to defendant), was standing by his squad car when he heard a series of gunshots and saw people running away from the nearby playground area. He approached the scene of the shooting, where he saw one victim lying on the ground "bleeding out" and a second victim running away. At trial, Jason was unable to recall whether he saw anyone firing a gun. But in his grand jury testimony on October 18, 2011, Jason stated that he had a clear line of sight to the shooter, whom he described as a black man with short dreadlocks, around 5'7" and 175 pounds, wearing a white t-shirt and dark jeans. Although he only saw a single shooter, he testified that the earlier gunfire sounded as if it came from two different caliber handguns.

¶ 8        Police and paramedics arrived on the scene, and Gladney was hospitalized with nine gunshot wounds. As for Oliphant, a medical examiner determined that he died of multiple gunshot wounds. Police collected evidence from the scene, including twelve 9-millimeter cartridge cases and seven .40-caliber cartridge cases.

¶ 9        The day after the shooting, on August 2, 2011, detectives visited Gladney in the hospital. Gladney told them that he did not see who shot him. On August 9, detectives brought Gladney to the police station, whereupon he told a different story: he said that Jones and Omar were the shooters and identified photographs of them. At trial, Gladney testified that he lied to the detectives on August 9 because they knew that he was "on the run from the Feds" and threatened to turn him over unless he said what they wanted to hear. (In fact, at the time of trial, Gladney was in federal custody for conspiracy to deliver heroin.) Detective Marco Garcia, one of the detectives who interviewed Gladney, denied threatening to turn him over to federal authorities.

¶ 10        A few days later, on August 12, 2011, at around 3 a.m., Officer Brandon Smith and his partner were on patrol in an unmarked squad car. They observed a car parked outside a house with loud music playing from its stereo, and two or three people drinking beer outside. They exited their squad car to "stop the noise disturbance"; as they did so, one of the beer drinkers dropped his beer and ran inside the house.

¶ 11        Smith's partner went to the front of the house while Smith went to the backyard. Through the back window of the house, Smith saw Jones standing inside, approximately five feet away. Jones was posing with two guns, one in each hand, while another man took photographs of him. Smith recognized the guns as Glock handguns because of their distinctive square-shaped barrels, and he also observed that both guns had extended magazines.

¶ 12        Smith radioed for backup. A few minutes later, five to ten backup officers arrived, entered the house, and began detaining individuals. Smith followed them inside, found Jones standing near the basement door, and "place[d] him in custody" for aggravated unlawful use of a weapon (AUUW). He then searched the basement and, in a washing machine, found two handguns: a Glock 9-millimeter semi-automatic pistol and a Glock .40-caliber semi-automatic

pistol, both with extended magazines and both loaded.  Smith recognized them as the handguns that Jones had been holding.  He did not find any other guns in the house.

¶ 13    State firearms identification expert Kellen Hunter tested the guns and determined that the 9-millimeter Glock matched all twelve of the 9-millimeter cartridge cases found at the scene of the crime.  The other gun did not match the remaining cartridge cases.

¶ 14    On September 28, 2011, Gladney spoke with an assistant State's attorney and gave a handwritten statement implicating Jones and Omar in the shootings.  He told the ASA that he initially claimed not to have seen who shot him because he planned to retaliate on his own, but after Oliphant's funeral, he decided that he "didn't want any more trouble" since "it was already enough that [he] lost [his] best friend."  On October 13, 2011, Gladney appeared before a grand jury and gave testimony consistent with his handwritten statement.

¶ 15    Jones and Omar were tried simultaneously before separate juries.  During trial, Hunter testified that Jones' 9-millimeter Glock matched the 9-millimeter cartridge cases recovered from the crime scene.  In reaching this conclusion, he considered both class characteristics (features designed by the manufacturer) and individual characteristics (irregularities and imperfections).  The common class characteristics he observed were caliber and the elliptical shape of the firing pin; the individual characteristics were "the shear mark as well as the breech face marks."  Hunter also testified, without objection, that the Illinois State Police lab requires all his conclusions to be verified by another examiner.

¶ 16    During cross-examination, counsel for Jones asked Hunter:

> "Q. And when you ultimately make that call [that a fired cartridge case matches a firearm], *** that decision is ultimately based on your subjective judgment, your training, and your experience?

A. Yes.

Q. There is no objective standard and there is no computer program or anything like that out there that tells you for certain, this cartridge case was or was not fired from this particular gun?

A. Yes. It was based on my training and experience as well as being verified by another court-qualified examiner."

Counsel for Jones did not object to this testimony.

¶ 17   During redirect examination, the State asked Hunter, "And, [in] this case, your work was validated as well, correct?" Over the defense's hearsay objection, Hunter was allowed to reiterate that his results were verified by "another court-qualified examiner."

¶ 18   Omar called Kenneth McNeal as a witness in his defense; Jones' jury was not present during McNeal's testimony. McNeal testified that he was in the parking lot when the shooting occurred. He saw Antoine's van but did not see Omar. When the shooting began, McNeal ran away and did not see who was firing. McNeal was impeached by his grand jury testimony, in which he stated that he glanced back while running and saw a man "let off two shots into the victim" (Oliphant). McNeal also told the grand jury that he heard more gunshots from the left side of the parking lot, which sounded like they came from a different gun.

¶ 19   During deliberations, Jones' jury sent a note requesting transcripts of Gladney's and Jason's grand jury testimony. (Jason's transcript was admitted into evidence, but Gladney's transcript was not.) After discussion with counsel and the deputy sheriff, the trial judge sent back a note saying, "You should have the Jason Jones grand jury document. *** Continue to deliberate. You have all the evidence and exhibits." The jury sent a second note stating that it had transcripts of both Jason's and McNeal's grand jury testimony, but not Gladney's.

¶ 20 Jones' counsel observed that McNeal was Omar's defense witness and that "[t]hey are deliberating with the wrong evidence," whereupon the court directed the deputy sheriff to remove the McNeal transcript from the jury. Jones' counsel then moved for a mistrial. The trial court denied the motion, observing that "[t]here is nothing inculpatory there."

¶ 21 The jury found Jones guilty of both the murder of Oliphant and the attempted murder of Gladney.

¶ 22 After his conviction but prior to sentencing, Jones obtained new counsel and moved for a new trial, arguing, among other things, that his trial counsel was ineffective for failing to seek suppression of the Glock recovered from the house party. In support, he argued:

> "The trial testimony revealed that on August 11, 2011, officer Smith illegally entered the backyard of 9125 S. Paulina and looked through a window into the home. He allegedly observed Jones holding a gun. Officer Smith along with other officers proceeded to enter the home without a valid consent or warrant. *** The officers' actions violated Jones' constitutional rights and should have been barred from evidence at trial."

¶ 23 At the hearing on Jones' motion, the trial court asked: "Did [Jones] have any standing to assert anything on that private property? *** If a gun is found in a dryer, does he have any standing to contest its recovery?" The State argued that Jones did not, since there was no evidence he lived at the house and, in fact, his arrest report listed a different residence for him. The State additionally argued there was no evidence that Jones was an invited guest at the house, and it was possible that the house was abandoned property or that Jones was trespassing.

¶ 24 The trial court denied Jones' motion for a new trial. Jones was sentenced to consecutive prison terms of 45 years for the murder of Oliphant and 25 years for the attempted murder of Gladney.

¶ 25                                      ANALYSIS

¶ 26        Jones argues that his conviction must be reversed because (1) his counsel was ineffective for failing to seek suppression of the handguns recovered from the house party; (2) the State lacked a foundation for Hunter's firearm identification testimony and also bolstered his conclusion with inadmissible hearsay; (3) the trial court erred by allowing the jury access to McNeal's grand jury testimony; and (4) the evidence was insufficient to prove Jones guilty of Oliphant's murder, since he did not personally shoot Oliphant and there was no evidence he shared a criminal design with Omar.  We consider these contentions in turn.

¶ 27                            Suppression of the Glocks

¶ 28        Jones' first argument is that his trial counsel was ineffective for failing to move to suppress the handguns recovered from the house party.

¶ 29        To prove ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) defendant was thereby prejudiced.  *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984)). For the performance prong, we are mindful that counsel's decision not to file a motion to suppress is typically " 'a matter of trial strategy, which is entitled to great deference.' " *People v. Bew*, 228 Ill. 2d 122, 128 (2008) (quoting *People v. White*, 221 Ill. 2d 1, 21 (2006)).  For the prejudice prong, Jones bears the burden of demonstrating "that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 30        We begin by considering the merits of the unargued suppression motion.  The fourth amendment to the United States Constitution protects people from unreasonable searches and seizures.  U.S. Const., amend. IV.  But fourth amendment rights are personal and may not be

vicariously asserted. *People v. Rosenberg*, 213 Ill. 2d 69, 77 (2004); *People v. McCauley*, 2018 IL App (1st) 160812, ¶ 29 (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)). Thus, before a defendant can seek to suppress the fruit of an unlawful search, he must first show that he is entitled to contest its legality. *McCauley*, 2018 IL App (1st) 160812, ¶ 29. A defendant may accomplish this by proving he had a legitimate expectation of privacy in the area searched. *Id.*; *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 23. Alternately, a defendant may prove that he was unlawfully arrested and the challenged search was the fruit of the unlawful arrest. *People v. Johnson*, 237 Ill. 2d 81, 92 (2010) ("evidence obtained as a result of an illegal arrest may be subject to the exclusionary rule and inadmissible" if there is a sufficient "causal nexus" between the illegal police activity and the disputed evidence) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963)); see also *People v. Horton*, 2019 IL App (1st) 142019-B, ¶¶ 82-85 (suppressing evidence discovered as a result of unlawful detention of defendant); *Henderson*, 2013 IL 114040, ¶¶ 31, 50 (although defendant was unlawfully seized, incriminating evidence later found by police was not the fruit of the unlawful seizure and therefore did not warrant suppression).

¶ 31    Here, Jones has not met his burden of showing that he had a legitimate expectation of privacy in the house where the party occurred. The record does not reflect that Jones resided at the house, or that he was an overnight guest, or that any other circumstances existed which would make an expectation of privacy reasonable. (In fact, during the hearing on his posttrial motion, Jones did not dispute the State's assertion that he resided elsewhere.) All we know, on this record, is that Jones was present in the house when the search occurred, which is plainly insufficient to create a reasonable expectation of privacy. See *City of Champaign v. Torres*, 214

Ill. 2d 234, 245 (2005) (defendant could not contest legality of warrantless search of residence where he was "just there to attend a party").

¶ 32    Jones next argues that his arrest was unlawful since Smith lacked a warrant or probable cause that he had committed a crime. As discussed, Smith testified at trial that he saw Jones posing for photos while holding two Glock handguns. He then radioed for backup. After the backup arrived, Smith entered the house, saw Jones standing near the basement door, and "plac[ed] him in custody" for AUUW. Smith then searched the basement and found the guns Jones had been holding.

¶ 33    These facts do not reflect that Smith had probable cause to believe that Jones had committed or was committing a crime at the time of his arrest. The AUUW statute then in effect allowed a citizen to carry a gun when "on his or her land" or when "on the land or in the legal dwelling of another person as an invitee with that person's permission." 720 ILCS 5/24-1.6(a)(1) (West 2010). Nothing in Smith's testimony suggests that he had any reason to believe that Jones was not in his own house or in a friend's house. On the contrary, Smith admitted that he never found out who owned the house. Additionally, Smith did not testify to any facts that would give rise to suspicion that Jones was committing another gun-related crime, such as burglary or assault.

¶ 34    But because there was no suppression hearing, and because the legality of Jones' possession of the handguns was not at issue at trial, the record is insufficiently developed for Jones to meet his burden of proof on this issue. We do not know, for instance, if Smith asked Jones to produce his Firearm Owners Identification (FOID) card prior to the arrest, or if Smith had other reasons, not stated at trial, for believing that Jones' possession of the handguns was unlawful. Therefore, we find that Jones has, on this record, failed to prove that his arrest was

illegal. *Bew*, 228 Ill. 2d at 135 (rejecting defendant's ineffective assistance claim on direct appeal where the record was insufficient to address defendant's arguments, but observing that defendant could still raise his claim in a postconviction petition); see also *Henderson*, 2013 IL 114040, ¶ 22 ("[W]here, as here, the defendant's claim of ineffectiveness is based on counsel's failure to file a suppression motion, the record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose.").

¶ 35    Additionally, even assuming *arguendo* that Jones' arrest was unlawful, Jones would still bear the burden of demonstrating that the guns recovered from the house were the fruit of his unlawful arrest. In determining this issue, we consider " 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' " *Henderson*, 2013 IL 114040, ¶ 33 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). Relevant factors include the temporal proximity of the illegal conduct and the discovery of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the illegal conduct. *Id.*

¶ 36    Here, Smith testified that when he entered the house, 5 to 10 backup officers had already entered and were "detaining individuals in the house." (It is unclear on what basis these individuals were detained.) Smith also testified that the entire house was searched. Under these circumstances, we cannot say whether the discovery of the guns was the fruit of Jones' arrest as opposed to the detention of the other partygoers. Again, we observe that, because there was no suppression hearing, the record has not been fully developed in this regard.

¶ 37    For these reasons, we find that Jones has not met his burden of showing that the unargued suppression motion is meritorious (*Henderson*, 2013 IL 114040, ¶ 15), and we therefore reject

his claim of ineffective assistance of counsel. *Patterson*, 2014 IL 115102, ¶ 87 (ineffective assistance claims may be decided on *Strickland*'s prejudice prong alone).

¶ 38                                    Hunter's Testimony

¶ 39         Hunter, the State's firearm identification expert, opined at trial that Jones' 9-millimeter Glock matched the 9-millimeter cartridge cases recovered from the crime scene. Jones argues that he lacked foundation for his opinion because he cited similarities in "the shear mark as well as the breech face marks" but did not describe those similarities.

¶ 40         Jones' argument is without merit. Illinois Rule of Evidence 705 provides: "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011); see *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 37 (explaining that "Rule 705 permits an expert to give an opinion without divulging the basis for it"); *People v. Williams*, 238 Ill. 2d 125, 140 (2010) ("[A]n expert testifying at trial may offer an opinion based on facts not in evidence, and the expert is not required on direct examination to disclose the facts underlying the expert's opinion.") Under Rule 705, "the burden is placed upon the adverse party during cross-examination to elicit facts underlying the expert opinion." *Williams*, 238 Ill. 2d at 140. Thus, Hunter was not required to describe the individual characteristics on which he based his conclusion that Jones' gun matched the cartridges at the crime scene.

¶ 41         Jones does not cite Rule 705, much less offer any argument as to why it does not apply here. Rather, he relies solely upon *People v. Jones*, 2015 IL App (1st) 121016, and *People v. Safford*, 392 Ill. App. 3d 212 (2009). But *Jones* was vacated pursuant to a supervisory order

entered by the Illinois Supreme Court and is no longer good law. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 116 ("We cannot consider *Jones*, as that judgment has no effect").

¶ 42        Jones' reliance on *Safford* is equally unavailing. In *Safford*, a latent print examiner testified that defendant's fingerprint matched one found near the scene of a shooting, but he did not explain how he arrived at that conclusion. *Safford*, 392 Ill. App. 3d at 217. The *Safford* court held that the lack of evidentiary foundation for the expert's testimony prevented the defense from conducting a meaningful cross-examination. *Id.* at 223-24. But this conclusion is irreconcilable with the plain language of Rule 705, which controls here. For this reason, "*Safford* has been heavily criticized, and characterized as an outlier." (Internal quotation marks omitted.) *People v. Robinson*, 2018 IL App (1st) 153319, ¶ 19 (observing that "we can find no published case following *Safford*'s reasoning"); see also *Simmons*, 2016 IL App (1st) 131300, ¶ 124 ("[L]ooking to *Safford* itself, we conclude that its analysis was flawed. While the court in *Safford* cited the principle that the information on which an expert bases his opinion must be reliable [citation], it did not correctly analyze that principle."); *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 41 (declining to follow *Safford*); *People v. Negron*, 2012 IL App (1st) 101194, ¶¶ 41-42) (same).

¶ 43        Accordingly, we also reject *Safford*. Illinois law is clear that the lack of detail in Hunter's testimony went to its weight, not to its admissibility. *Robinson*, 2018 IL App (1st) 153319, ¶ 19; *Negron*, 2012 IL App (1st) 101194, ¶ 42.

¶ 44        Jones next contends that the trial court committed reversible error by allowing Hunter to testify that his conclusion was verified by another examiner. He argues that this testimony was inadmissible hearsay and violated his right to confront witnesses against him as set forth in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004).

¶ 45    The State argues that Hunter's testimony was not hearsay because it was not offered for the truth of the matter asserted, but merely to show the basis for Hunter's opinion. See *People v. Risper*, 2015 IL App (1st) 130993, ¶ 35 (an out-of-court statement offered to prove something other than the truth of the matter asserted is, by definition, not hearsay); *People v. Anderson*, 133 Ill. 2d 1, 12 (1986) (expert may reveal the contents of materials on which he reasonably relies to make his opinion, and doing so for that limited purpose does not constitute hearsay). We find the State's argument questionable, since in this case the "matter asserted" by the verifying expert was exactly the same as Hunter's opinion, such that asserting the truth of the latter is synonymous with asserting the truth of the former. See *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005) (fingerprint examiner's testimony that the quality assurance department agreed with her identification was offered to prove the truth of the matter it asserted, namely, that the department found the prints were defendant's). Under these circumstances, the State's assertion that it did not intend the jury to substantively believe the opinion of the verifying expert is, at best, dubious.

¶ 46    However, Jones did not raise any objection on direct examination when Hunter testified that all his conclusions are verified by another examiner, nor did he object during cross-examination when Hunter said that the verification helped form the basis for his conclusion. Accordingly, he has forfeited any claim of error with regard to these statements. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). Since he also does not argue plain error, we honor Jones' forfeiture. See *People v. Hillier*, 237 Ill. 2d 539, 550 (2010) (appellate court erred in reaching merits of issues where defendant forfeited issues and did not argue plain error).

¶ 47    The only complained-of testimony to which Jones raised an objection was Hunter's statement on redirect examination that his conclusion was verified by another examiner. But this

testimony was cumulative of his prior testimony and, therefore, any error in its admission was harmless. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 65 (erroneous admission of hearsay evidence is harmless error when it is merely cumulative); *Yancy*, 368 Ill. App. 3d at 387 (hearsay fingerprint identification testimony was cumulative of testifying expert's testimony and did not warrant reversal). Jones' confrontation clause argument is unavailing for the same reason. *People v. Patterson*, 217 Ill. 2d 407, 427-28 (2005) (*Crawford* violations are subject to harmless-error analysis, which includes "determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence"). Thus, Hunter's testimony regarding the verification of his conclusion does not warrant reversal.

¶ 48                                 McNeal's Grand Jury Testimony

¶ 49        Jones next argues that his conviction must be reversed because McNeal's grand jury testimony was given to the jury in error. Although it is improper during deliberations for the jury to view items which have not been entered into evidence (*People v. Long*, 316 Ill. App. 3d 919, 928 (2000)), such error is only cause for reversal if the defendant was thereby prejudiced. *People v. Taylor*, 166 Ill. 2d 414, 438-39 (1995) (error in giving jury access to slip opinion was "harmless beyond a reasonable doubt"); *Long*, 316 Ill. App. 3d at 928 ("Where an error of this type could not have reasonably affected the outcome of the trial, the verdict will be affirmed"). Here, Jones does not claim that he was prejudiced by the jury's access to the McNeal transcript, nor do we find any evidence of prejudice in the record. On the contrary, the trial court found that the transcript contained "nothing inculpatory" as to Jones since "no one is named," a finding which Jones does not dispute.

¶ 50        Jones' cited cases are inapposite, since they involve situations where the jury's access to extraneous materials was prejudicial. See *People v. Holcomb*, 370 Ill. 299, 300 (1938)

(unadmitted exhibits were "damaging links" that "would tend to unduly influence the jury against defendant"); *People v. Carr*, 53 Ill. App. 3d 492, 497 (1977) (error was "clearly prejudicial"); *Long*, 316 Ill. App. 3d at 928 (same); *People v. Fields*, 258 Ill. App. 3d 912, 918 (1994) (error was not harmless under the circumstances). Here, where it is undisputed that the McNeal transcript did not implicate Jones, the jury's access to the transcript was harmless error.

¶ 51                                   Sufficiency of the Evidence

¶ 52      Finally, Jones argues that the evidence was insufficient to prove him guilty of Oliphant's murder. (He does not raise any argument as to the attempted murder of Gladney.) Although both Jones and Omar fired at Gladney, Omar was the only one witnessed firing at Oliphant; thus, Jones was convicted of Oliphant's murder on a theory of accountability. Jones argues that the State failed to show that he shared a common criminal design with Omar.

¶ 53      When reviewing the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Rather, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 54      A person is legally accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). To establish the requisite intent, the State must prove that the defendant shared the principal's criminal intent or there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Where a

-16-

common criminal design exists, any acts performed in furtherance of that design committed by one party are considered to be the acts of all parties to the design, and all such parties are responsible for the consequences of those acts. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 55    The State argues that a rational finder of fact could have found that Jones and Omar shared a common criminal design to kill Gladney, and Omar killed Oliphant in furtherance of that goal. We agree. According to Gladney's handwritten statement and grand jury testimony, Jones and Omar were simultaneously shooting at him, thus demonstrating a common design to kill him. See *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) ("To sustain a charge of attempt murder, it is sufficient to discharge a weapon in the direction of another individual, either with malice or total disregard for human life"). Thus, Jones and Omar were accomplices in the attempted murder of Gladney.

¶ 56    It can also reasonably be inferred that Omar shot Oliphant in furtherance of the attempted murder of Gladney. Specifically, after Omar initially shot Gladney in the back, Oliphant intervened by grabbing Omar, thus giving Gladney time to flee. Omar struggled with Oliphant and shot him multiple times before Oliphant fell to the ground, leaving Omar free to resume firing at Gladney.

¶ 57    Jones argues that he did not intend to harm Oliphant, nor did he have advance knowledge that Omar was going to harm Oliphant. But as our supreme court has stated, "there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that was planned or intended." *Fernandez*, 2014 IL 115527, ¶ 19. Because Jones and Omar both intended to kill Gladney, Jones can be held accountable for Omar's actions in furtherance of that attempted murder even if he did not plan or intend Oliphant's murder. *Id.*

¶ 58      *People v. Perez*, 189 Ill. 2d 254 (2000), and *People v. Estrada*, 243 Ill. App. 3d 177 (1993), cited by Jones in his brief, are distinguishable because neither involved a principal and an accomplice shooting at the same victim. In *Perez*, the court held that the defendant's gang affiliation and his presence at a murder scene, without more, were insufficient to prove that he aided or abetted the killer. *Perez*, 189 Ill. 2d at 268. Similarly, in *Estrada*, defendant's conviction for murder was reversed where he smashed a window at the scene of the shooting but did not participate in the shooting. *Estrada*, 243 Ill. App. 3d at 185. By contrast, Jones' actions in firing at Gladney showed that he did in fact share a common criminal design with Omar.

¶ 59      Finally, Jones argues that Gladney was not a credible witness because (1) he changed his story multiple times; (2) on the night of the shooting, he consumed tequila and ecstasy and had been smoking marijuana "all day"; and (3) he admitted being high when the shooting occurred. Jones is, in effect, inviting us to substitute our judgment regarding Gladney's credibility for that of the jury, which we will not do. See *Jackson*, 232 Ill. 2d at 280-81; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (it is well established that "[a] conviction will not be reversed simply because the defendant tells us that a witness was not credible"). Viewing the evidence in the light most favorable to the prosecution, as we must, we find the evidence was sufficient to convict Jones of Oliphant's murder.

¶ 60                           CONCLUSION

¶ 61      For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 62      Affirmed.