2025 IL App (1st) 240709-U

No. 1-24-0709

Order filed November 21, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 1778502 |
| | ) | |
| CARNELL JONES, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Mikva and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's dismissal of defendant's postconviction petition at the third stage of proceedings after an evidentiary hearing because it was not manifestly erroneous to find that trial counsel was not ineffective for not filing a motion to suppress evidence when there was no reasonable probability that it would have been granted.

¶ 2    Defendant Carnell Jones appeals from the third-stage dismissal of his postconviction petition after an evidentiary hearing. On appeal, defendant contends that the trial court erred in

denying his postconviction petition where there was a reasonable probability that, had trial counsel filed a motion to suppress evidence, it would have been granted. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      An extensive recitation of the facts can be found in defendant's direct appeal. *People v. Jones*, 2020 IL App (1st) 181263-U. We summarize the facts necessary to resolve the issues presented in this appeal.

¶ 5                                    A. Underlying Events

¶ 6      Following a simultaneous but separate jury trial with his codefendant, Omar Williams, defendant was convicted of the murder of Javonne Oliphant and the attempted murder of Andre Gladney.

¶ 7      On July 1, 2011, at approximately 11:15 p.m., Gladney and Oliphant were shooting dice near the ABLA Homes housing project. Gladney testified that he drank a cup of tequila and was high, although it did not affect his ability to function. Gladney gave several conflicting accounts of what occurred that evening, significantly changing his trial testimony from his handwritten statement of September 28, 2011, and his grand jury testimony, both of which were admitted as substantive evidence at defendant's trial. In his statement and grand jury testimony, Gladney testified that he knew defendant from the neighborhood. Gladney stated that he saw defendant and codefendant with another man in the parking lot. An argument ensued between Oliphant and codefendant, during which Gladney attempted to move away. He was grabbed from behind by codefendant, and codefendant shot him in the back. When Gladney fell to the ground, codefendant shot him two more times. Oliphant then grabbed codefendant and they began to tussle. Gladney

got up and ran away towards the playground. Gladney looked back and saw codefendant shoot Oliphant three times, after which, codefendant and defendant shot at Gladney. Also in his statement, Gladney stated that he initially claimed not to have seen the shooter because he planned to retaliate on his own, but after Oliphant's funeral, he decided that he did not want any more trouble since it was already enough that he had lost his best friend.

¶ 8    Jason Jones (no relation to defendant), a security guard at ABLA Homes, was standing by his squad car when he heard a series of gunshots and saw people running away from the nearby playground area. He walked over to the playground area and saw a victim lying on the ground "bleeding out," and a second victim running away. At trial, Jason could not recall if he saw anyone firing a gun. However, during his grand jury testimony on October 18, 2011, Jason stated that he had a clear line of sight to the shooter and gave a physical description. Despite only seeing one shooter, Jason had previously testified that the earlier gunfire sounded as if it came from two different caliber handguns.

¶ 9    Police and paramedics arrived on the scene and collected evidence from the scene, including twelve 9-milimeter cartridge cases and seven .40-caliber cartridge cases. Gladney was hospitalized with nine gunshot wounds and a medical examiner later determined that Oliphant died of multiple gunshot wounds.

¶ 10    The day after the shooting on July 2, 2011, detectives visited Gladney in the hospital. Gladney told them that he did not see who shot him. However, Gladney subsequently told a different story at the police station, identifying defendant and codefendant as the shooters and identifying photographs of them. At defendant's trial, Gladney stated that he lied to the police

because they knew he was "on the run from the Feds," and threatened to turn him in to federal authorities.[1] Police denied threatening to turn Gladney over to federal authorities.

¶ 11    On August 12, 2011, at approximately 3 a.m., Chicago Police Officer Brandon Smith and his partner were on patrol near 91st and Paulina Streets when they saw a car parked in front of a house with loud music playing and two or three people drinking beer outside. When the officers exited their vehicle to stop the noise disturbance, one of the beer drinkers dropped his beer and ran inside the house. Smith's partner went to the front of the house while Smith went to the backyard. Through the back window of the house, Smith saw defendant standing inside, posing with two guns, one in each hand, while another man took pictures of him. Defendant was approximately five feet from the window. Smith recognized the guns as Glock handguns because of their distinctive square-shaped barrels, and he also saw that both guns had extended magazine.

¶ 12    Smith called for backup; five to ten backup officers arrived within a few minutes, entered the house and began detaining individuals. Smith followed them inside, found defendant standing near the basement door and placed him in custody for aggravated unlawful use of a weapon (AUUW). Smith then searched the basement and found two handguns inside a washing machine: a Glock 9-milimeter semi-automatic pistol and a Glock .40-caliber semi-automatic pistol, both loaded with extended magazines. Smith indicated that those were the handguns defendant was holding when he initially saw him through the window, and  no other guns were recovered from the house.

---

[1] At the time of trial, Gladney was in federal custody for conspiracy to deliver heroin.

¶ 13    State Firearms identification expert Kellen Hunter tested the guns and determined that the Glock 9-milimeter matched all twelve of the 9-milimieter cartridge cases found at the scene of the shooting. The other gun did not match the remaining cartridge cases.

¶ 14    Defendant was subsequently sentenced to 45 years for murder and 25 years for attempted murder.

¶ 15                                B. Direct Appeal

¶ 16    Defendant, who was represented at trial by an assistant public defender, filed his appeal by private counsel. On appeal, defendant contended that his conviction must be reversed because (1) his trial counsel was ineffective for failing to move to suppress evidence that he possessed one of the guns used in the incident; (2) the State lacked a foundation for the opinions of its firearm identification expert and bolstered his conclusion with inadmissible hearsay; (3) the trial court erred by allowing the jury access to a transcript of grand jury testimony introduced only as to his codefendant; and (4) the evidence was insufficient to prove defendant guilty of Oliphant's murder. This court affirmed defendant's convictions and sentences.

¶ 17    Of specific importance to this appeal was this court's analysis of defendant's ineffective assistance of counsel claim, which was based on violation of his fourth amendment right to privacy. This court found that:

> "[defendant] has not met his burden of showing that he had a legitimate expectation of privacy in the house where the party occurred. The record does not reflect that [defendant] resided at the house, or that he was an overnight guest, or that any other circumstances existed which would make an expectation of privacy reasonable. (In fact, during the hearing on his posttrial motion, [defendant] did not dispute the State's assertion

that he resided elsewhere.). All we know, on this record, is that Jones was present in the house when the search occurred, which is plainly insufficient to create a reasonable expectation of privacy. See *City of Champaign v. Torres*, 214 Ill. 2d 234, 245 (2005) (defendant could not contest legality of warrantless search of residence where he was "just there to attend a party")." 2020 IL App (1st) 181263-U, ¶ 31.

¶ 18    This court further found that the record was insufficient to determine the merits of defendant's claim of illegal arrest.

¶ 19                                    C. Post-Conviction Proceedings

¶ 20    Defendant subsequently retained different counsel and filed a postconviction petition on February 28, 2022, contending that he received ineffective assistance of counsel due to trial counsel's failure to file a motion to suppress the firearm. Attached to the petition was the affidavit of Chiniqua Wesley, who was the tenant of the home where the guns were recovered. Wesley averred that she had never seen defendant with a gun and that defendant was a guest at her party.

¶ 21    On May 2, 2022, defendant filed a supplemental petition, which included a second affidavit from Wesley. The supplemental petition argued that, pursuant to *Minnesota v. Olson*, 495 U.S. 91 (1990), *People v. Parker*, 312 Ill. App. 3d 607 (1990), and related cases, defendant was an overnight houseguest with expectations of privacy that gave him standing to file a motion to suppress the firearms seized at the home.

¶ 22    Among other things, Wesley's second affidavit averred that defendant was an overnight guest of hers at the home; she expressly invited him as an overnight guest because she did not want him to drive or walk home if he decided to drink that evening at the party; at no time did she see him or anyone else with a gun; she did not see or hear the officers interacting with defendant ask

if he had a gun license; she lived at the property full-time; she had a place set aside for him to spend the night; she could see and hear defendant at all times when he was communicating with law enforcement; she and several of her guests felt that the action of the police violated their Fourth amendment rights; and she came forward due to recently hearing via word of mouth and some social media about defendant trying to find justice for the events of that night.

¶ 23     On May 18, 2022, the trial court advanced defendant's postconviction petition to the second stage. The State did not file a motion to dismiss the petition but instead filed an answer to the petition. The petition then  proceeded to an evidentiary hearing on November 16, 2023.

¶ 24     At the evidentiary hearing, defendant called Wesley and his appellate attorney, Gal Pissetzky as witnesses on his behalf. Wesley testified on direct examination that she flew in from Oklahoma to testify at the hearing and received no compensation besides her ticket. She stated that prior to moving to Oklahoma, she rented a house at 9125 South Paulina in Chicago, which was a single-story home with a basement. On August 12, 2011, Wesley hosted a birthday party for her friend, Maurice Fitch, which was attended by approximately 40 people. While the party was underway, she struck up a conversation with defendant, who asked if he could spend the night, and she told him that he could use her guest bedroom. Wesley testified that she saw no weapons at the party and would not have allowed weapons.

¶ 25     On cross-examination, Wesley testified that she did not personally invite defendant to the party but did invite him to stay and she assumed that he would be spending the night. Wesley also testified that she assumed that if defendant sobered up, he would not need to stay over. At the time of the party, Wesley and defendant knew each other but only on a first-name basis. She stated that she was motivated to reach out to defendant because she heard that it was falsely alleged that he

had been arrested in an abandoned property. Wesley further testified that she signed two affidavits, the first of which did not mention defendant's status as an overnight guest, and the second one which she signed after speaking with defendant's attorney.

¶ 26 On redirect examination, Wesley testified that she had not fabricated any part of the affidavits, nor did defendant's attorneys tell her what to put in the affidavits. She also stated that it was "first come, first serve" in terms of who could crash at her house on the night of the party, on the couch, the loveseat or the floor, but she never rescinded her invitation to defendant.

¶ 27 Attorney Gal Pissetzky testified that he represented defendant in his posttrial and direct appeal. He stated that he had tried more than 100 criminal cases. On review of the police reports, general progress reports, and the transcripts of defendant's trial, Pissetzky believed that trial counsel should have filed a motion to suppress the guns recovered in Wesley's house on the basis that police had allegedly seen defendant with the weapons through a window from a private backyard that they entered without lawful justification. Pissetzky concluded that trial counsel was ineffective for failing to file a motion to suppress, because nothing in the police reports indicated that the police had a right to enter that backyard.

¶ 28 On cross-examination, Pissetzky stated that he had no contact with defendant prior to the trial.

¶ 29 The State called defendant's trial counsel, assistant public defender Margaret Domin, who testified that she did not file a motion to suppress because she did not believe that defendant had any expectation of privacy in Wesley's house and he gave her no indication that he was an overnight guest that night.

¶ 30    On cross-examination, Domin admitted that she did not speak with any of the party guests and did not send out investigators with the aim of looking into defendant's standing to assert privacy rights for the purposes of a motion to suppress. She stated that defendant told her that he did not know anyone at the party and she did not investigate who owned the property where defendant was arrested.

¶ 31    On redirect examination, Domin testified that she discussed the events that occurred at 9125 South Paulina with defendant for the purpose of determining whether he had standing to file a Fourth amendment motion to suppress. Based on what defendant told her, Domin determined that he had no reasonable expectation of privacy in the house.

¶ 32    On recross examination, Domin was asked whether it would have been reasonable for her to ask defendant about the potential for spending the night at the house, given that the party started at midnight. Domin responded that she simply wanted to know why he was there.

¶ 33    After hearing argument from both sides, the trial court denied defendant's postconviction petition, after finding that Wesley did not really specifically invite defendant but had merely suggested to several people that they could spend the night if they were too intoxicated. The trial court further noted that Wesley stated that she had met defendant before, did not know his full name, never went to the trial and did not speak with defendant's trial counsel. The court found that defendant did not show in any way that there would be any reason for success on a motion to suppress evidence on a theory of defendant having standing and an expectation of privacy at that house based on an overnight guest theory. The trial court found Wesley's testimony was believable that basically she said people could crash at her house, which was insufficient to support any finding to suppress evidence based on an overnight guest theory of standing. Additionally, the trial

court found that there was no evidence presented that Domin was ineffective for not filing a motion to suppress because she did not have any knowledge of this theory of overnight guest by defendant that is now being presented. The trial court's order denying the petition was entered on March 14, 2024.

¶ 34 Defendant filed his timely notice of appeal on March 22, 2024.

¶ 35                                    II. ANALYSIS

¶ 36    As noted above, defendant contends that the trial court erred in denying his postconviction petition where there was a reasonable probability that, had trial counsel filed a motion to suppress evidence, it would have been granted. He argues that he presented sufficient evidence to establish a legitimate expectation of privacy to challenge the officers' warrantless search and seizure because the undisputed evidence was that he was an invited overnight guest of the leaseholder of the home searched. Defendant further maintains that the officers conducted an illegal, warrantless search and seizure of the home where defendant was an overnight guest, and thus there is a reasonable likelihood that a motion to suppress evidence would have been granted if trial counsel had filed one prior to trial. Additionally, defendant contends that the trial court erred in not granting his postconviction petition because he proved that there was a reasonable likelihood a motion to suppress would have been granted and that he suffered prejudice as a result. Defendant seeks a reversal of the trial court's denial of his postconviction petition and a new trial.

¶ 37    The Postconviction Hearing Act (Act) provides a means by which a petitioner may challenge his conviction for substantial violations of federal or state constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2022)); *People v. Harris*, 2025 IL 130351, ¶ 31. An action seeking postconviction relief is not an appeal from the underlying judgment but, rather, a collateral attack

on the judgment. *Harri*s, 2025 IL 130351, ¶ 31. To prevail under the Act, a petitioner must prove that he suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. *Id.*

¶ 38 Under the procedural framework of the Act, there are three stages of postconviction proceedings. *Id.* ¶ 32. At the first stage, the circuit court determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). If the petition isn't dismissed at the first stage, it advances to the second stage, where the court may appoint counsel, who may amend the petition as necessary, and the State may file a motion to dismiss the petition or answer the petition. *Id*. §§ 122-4, 122-5.

¶ 39 At this pleading stage, the court determines whether the allegations in the petition and any accompanying documentation make a "substantial showing of a constitutional violation." *Harris*, 2025 IL 130351, ¶ 33. If the petitioner makes the requisite showing, the petitioner is entitled to a third-stage evidentiary hearing. 725 ILCS 5/122-6 (West 2022).

¶ 40 The ultimate hurdle for a petitioner is then the third-stage evidentiary hearing, where the trial court serves as the factfinder, determining witness credibility, deciding the weight to be given testimony and evidence, and resolving any evidentiary conflicts. *Harris*, 2025 IL 130351, ¶ 40. The petitioner has the burden to ultimately prove by a preponderance of the evidence that his constitutional rights were violated, warranting a new trial. *Id.* The preponderance of the evidence is evidence that renders a fact more likely than not. *Id*. § 41.

¶ 41 When a petition advances to a third-stage evidentiary hearing, where factfinding and credibility determinations are involved, we will not reverse the trial court's ruling unless it is manifestly erroneous; that is unless it is against the manifest weight of the evidence. *People v.*

*Brickhouse*, 2018 IL App (3d) 150807, ¶ 38. A ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record or if the ruling itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.*

¶ 42    A claim of ineffective assistance of counsel is analyzed under the two-pronged, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Brickhouse*, 2018 IL App (3d) 150807, ¶ 39. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that defense counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant to the extent that he was deprived of a fair proceeding. *Id.* A defendant's failure to satisfy either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel. *Id.* In reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct. *Id.* A strong presumption exists that defense counsel's conduct was within the wide range of reasonable professional assistance and that all decisions were made in the exercise of reasonable professional judgment. *Id.* In additional, matters of trial strategy will generally not support a claim of ineffective assistance of counsel, even if defense counsel made a mistake in trial strategy or tactics or made an error in judgment. *Id.* Only if counsel's strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found. *Id.*

¶ 43    Whether to file a motion to suppress is generally a matter of trial strategy and not subject to a claim of ineffective assistance of counsel. *Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. In order to establish prejudice resulting from defense counsel's failure to file a motion to suppress, a defendant must show a reasonable probability that (1) the motion to suppress would have been

granted and (2) the outcome of the trial would have been different had the evidence been suppressed. *Id.* Essentially, defense counsel's failure to file a motion to suppress does not establish incompetent representation if the motion would have been futile.

¶ 44    Here, defendant's postconviction petition asserted that his trial counsel was ineffective for failing to file a pretrial motion to suppress the guns recovered on August 12, 2011, based on a violation of his fourth amendment privacy right as an overnight guest of the leaseholder of the premises.

¶ 45    The fourth amendment of the United States Constitution guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV. Generally, reasonableness under the fourth amendment requires a warrant supported by probable cause. *People v. Turner*, 2022 IL App (5th) 190329, ¶ 35. However, there are a few specifically established and well-delineated exceptions to the warrant requirement. *Id.*

¶ 46    Under the privacy-based approach to fourth amendment case law, the fourth amendment protects a person only to the extent that the person has a subjective expectation of privacy in the area searched that society recognizes as reasonable. *Turner*, 2022 IL App (5th) 190329, ¶ 41. Whether one has a legitimate expectation of privacy in an area searched is measured by an objective standard drawn from common experience. *Id.* The burden of establishing a legitimate expectation of privacy lays with defendant. *Id.*

¶ 47    We resolve whether defendant has a legitimate expectation of privacy in light of the totality of the circumstances of the particular case. *Id.* ¶ 42. There is no bright-line rule. *Id.* Our supreme court has stated that courts should consider whether defendant (1) owned the area searched, (2) was legitimately present in the area, (3) had a possessory interest in the area, (4) used the area

before, (5) had the ability to control or exclude others from the area, and (6) had a subjective expectation of privacy in the area. *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986). While warrantless entry into one's home is the primary evil to which the fourth amendment's language is directed, the United States Supreme Court has found legitimate expectation of privacy in another's residence for overnight guests (*Minnesota v. Olson*, 495 U. S. 91, 99-100 (1990)), hotel rooms for its occupants (*Stoner v. California*, 376 U.S. 483, 490 (1964)), and employees' workplaces (*O'Connor v. Ortega*, 480 U.S. 709, 716 (1987)).

¶ 48    Illinois courts have repeatedly declined to grant standing for fourth amendment challenges to search and seizures to persons who are guests or merely present in someone else's home or on another person's property which is searched. *People v. Wimbley*, 314 Ill. App. 3d 18, 23 (2000). See also *People v. Ervin*, 269 Ill. App. 3d 141, 147 (1994). As noted above, overnight guests in private homes have a sufficiently legitimate expectation of privacy in the premises to confer standing to challenge a search. *Id.* See also *Olson*, 495 U.S. at 99-100. The overnight guest seeks shelter in another's home precisely because it provides him privacy and a place where he and his possessions will not be disturbed. *Wimbley*, 314 Ill App. 3d at 23. As recognized by the court in *Olson*, "[w]e are at our most vulnerable when we are asleep because we cannot monitor our own safety." And "when we cannot sleep in our home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend." *Olson*, 495 U.S. at 99.

¶ 49    Turning to the case at bar, after having reviewed the record, we find that the trial court properly denied defendant's postconviction petition following a third-stage evidentiary hearing. We begin by analyzing the factors set forth by our supreme court in evaluating fourth amendment

right to privacy challenges, and find that of the six factors, defendant has only established one of them.

¶ 50   Defendant was legitimately present in the home as one of the party guests, although Wesley stated that she did not personally invite him to the party. However, defendant did not present any evidence of the remaining five factors. First, the record is clear that defendant did not own the premises searched; Wesley testified that she was the leaseholder of the searched premises where the guns were recovered. Defendant presented no evidence that he had a possessory interest in Wesley's home, that he had ever been to Wesley's home before, that he had the ability to control or exclude others from the home, or that he had a subjective expectation of privacy in Wesley's home.

¶ 51   While defendant attempted to establish that he had a subjective expectation of privacy in Wesley's home by arguing that he was an overnight guest, that conclusion is contradicted by the record. The record indicates that Wesley submitted two affidavits during the postconviction proceedings, with defendant's initial petition and the supplemental petition. The first affidavit only stated that Wesley had never seen defendant with a gun and that he was a guest at her party. The second affidavit, submitted after speaking with defendant's postconviction counsel, averred that defendant was an overnight guest that was expressly invited to stay over. However, at the evidentiary hearing, Wesley's testimony contradicted her second affidavit, in which she indicated that she did not personally invite defendant to the party, defendant asked if he could spend the night, and while she did agree, she had a "first come, first serve" policy on guests who decided to stay over after the party. Wesley also testified that if defendant sobered up, she assumed that he would not need to stay over. This testimony challenged defendant's argument that he was an

overnight guest (which generally implies that one was invited to stay over) rather than just merely a party guest who might crash there for the night.

¶ 52 Additionally, defendant's trial counsel testified that defendant never mentioned to her that he was going to spend the night at Wesley's home; rather, he told her that he did not know anyone at the party. Defendant's trial counsel also stated that based on what defendant told her about the party, she did not believe that he had any reasonable expectation of privacy in the house and did not pursue a motion to suppress on that basis.

¶ 53 The trial court concluded that the witnesses were credible but that despite this, defendant had failed to establish by a preponderance of the evidence that he was an overnight guest who had a legitimate expectation of privacy at Wesley's home and thus standing to bring a fourth amendment challenge. Thus, defendant has not established a reasonable likelihood that such challenge would have been successful, despite his assertions to the contrary.

¶ 54 If defendant had no standing to bring a fourth amendment challenge, it follows then that his trial counsel cannot be ineffective for failing to file a futile motion to suppress based on a meritless fourth amendment privacy rights challenge. We find that the trial court's finding that defendant's trial counsel was not ineffective was not manifestly erroneous; the arguments made are not so clearly meritorious as defendant argues they are.

¶ 55                    III. CONCLUSION

¶ 56 For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 57 Affirmed.