2021 IL App (2d) 190833
No. 2-19-0833
Opinion filed February 22, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-585 |
| TYRONE PEARSON, | ) ) ) | Honorable Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Tyrone Pearson, went to Rockford Memorial Hospital to be treated for gunshot wounds to his legs.   Rockford police officer Maruisz Misiaszek went to the hospital, entered the trauma room where Pearson was being treated, picked up Pearson's clothing, and went through the pockets.   He found cocaine.   Pearson moved to suppress the cocaine, arguing that the warrantless search by Misiaszek violated the fourth amendment (U.S. Const., amend. IV). The trial court initially granted the motion to suppress but then reconsidered its ruling.   The matter proceeded to a stipulated bench trial, at which Pearson was found guilty of possession of a controlled substance (720 ILCS 570/402(c) (West 2014)).   Pearson appeals, arguing that the cocaine should have been suppressed.   We reverse.

¶ 2                                 I. BACKGROUND

¶ 3    The following testimony was provided by Misiaszek at the suppression hearing. Misiaszek was a patrol officer.    He had been a police officer for about 2½ years at the time of the incident.    Although he was not an evidence technician, his duties included collecting evidence.

¶ 4    On March 15, 2015, the Rockford Police Department was notified that a gunshot victim had arrived at Rockford Memorial Hospital.    Misiaszek was dispatched to the hospital. Misiaszek knew Pearson's name and that he had been shot.    No search or arrest warrant had been issued in connection with Pearson, and Misiaszek did not suspect him of having committed any crime.

¶ 5    Misiaszek arrived about 4 p.m. and met up with fellow Rockford police officer Mark Danner outside of the trauma room where Pearson was being treated.    Misiaszek learned that Pearson had wounds in both legs; the bullet had traveled through Pearson's right thigh and into his left thigh.    According to Danner, Pearson said that he was buying some CDs or DVDs and heard a shot.    He began running and then realized that he had been shot.    He flagged down a car and was driven to the hospital.    After relaying this account, Danner, whose shift was over, turned the investigation over to Misiaszek and left.

¶ 6    Misiaszek entered the trauma room where Pearson was being treated.    He testified that he wanted to gather information and eventually catch the person who had shot Pearson.    There is no indication that he asked permission from anyone to enter the room.    Various medical personnel were in the room.    Pearson was sitting up in the bed, dressed in a hospital gown.    His clothes, which included blue jeans, shoes, and a shirt, were laid to one side on a metal tray.    The jeans were loosely folded and "there was blood on them."    Misiaszek asked Pearson what happened. Pearson gave Misiaszek the same account of his shooting that Danner had reported.

¶ 7     Donning rubber gloves, Misiaszek went over to the clothing and picked up the jeans. Misiaszek testified that, because the jeans likely had been "affected" when Pearson was shot in the legs, they were evidence of a crime.    He inspected them, noting the number and location of the bullet holes.    He then searched the pockets of the jeans, reaching into them.    In the left back pocket, he found a plastic bag containing four smaller clear plastic bags with a white powder in them.    In the right front pocket, he found $35.    There had not been anything protruding from the pockets, and Misiaszek had not known that there was anything in the pockets until he put his hand in them.    When he picked up the jeans, it did not feel like there was anything heavy in the pockets. Misiaszek did not ask Pearson's consent before searching the jeans.

¶ 8     Asked at the suppression hearing why he searched the pockets of the jeans, Misiaszek gave several explanations.    He testified that, because the jeans were evidence of a crime, they "were going to be recovered," and he wanted to make sure that there was "no physical evidence" left behind.    He agreed with the suggestion of the State's attorney that it was possible that he could find evidence of the shooting, such as a bullet casing, in the pockets of the jeans.    However, he had never personally encountered a situation where a bullet casing was found in the victim's clothing.

¶ 9     The trial court asked him whether he was conducting an inventory search.    Misiaszek said he would not call it that, as that was more for impounded vehicles.    The trial court then asked, "I mean, what happens if they have a wallet in there with money?" and asked if that was why Misiaszek searched the pockets.    Misiaszek agreed that it was "for both," and said that he wanted to "see if there was any physical evidence" and also remove any "valuables that need[ed] to go

with the victim" when the jeans were tagged into evidence. Before he searched the pockets, he did not suspect Pearson of having cocaine or other illegal drugs.[1]

¶ 10 Misiaszek did not actually collect the jeans as evidence—that was done by a police evidence technician, Bruce Voyles, who arrived at the hospital a little later. Misiaszek testified that such technicians were called out whenever there was a shooting. However, if no evidence technician was available, whichever officer was present would collect evidence. Misiaszek testified that, at the time he searched Pearson's jeans, he did not know whether an evidence technician was available and thus he "planned" to collect them as evidence. He had an evidence collection bag in his car. However, he was not collecting the jeans as evidence at the specific moment when he picked up, inspected, and searched them.

---

[1] After he searched the jeans, Misiaszek was told by hospital personnel that they had placed Pearson's phone and over $1100 in cash in a hospital property bag. At some point, the police took possession of the bag and its contents. The trial court granted the motion to suppress as to those items, finding no justification for their seizure. See *People v. Humphrey*, 361 Ill. App. 3d 947, 951 (2005) (seizure of item was not proper where, although item appeared "suspicious" to police officer, police lacked probable cause to believe that it was contraband or evidence of crime); see also *People v. Butler*, 2015 IL App (1st) 131870, ¶ 47 (rejecting argument that officer's seizure and later search of gunshot victim's cell phone in hospital was justified, as there was no probable cause to believe that the phone contained evidence about the shooting). Although the trial court reconsidered its decision to suppress the contents of Pearson's jeans pockets, it did not reconsider its suppression of the items in the property bag. No evidence regarding the items in the bag was introduced at trial.

¶ 11   Following the parties' arguments, the trial court granted the motion to suppress. It summarized Misiaszek's testimony about why he had searched Pearson's jeans pockets as, "I went into the pocket to see if any evidence of a crime was found and also to inventory his property." It found that Pearson had no reasonable expectation of privacy in the trauma room, saying that, if an area was generally open to the public, no warrant was needed to enter. However, the trial court found that Pearson did have a reasonable expectation of privacy in his clothing and also had a possessory interest such that the police could not simply take the jeans, especially in the absence of probable cause to believe that Pearson was committing or had committed a crime. Accordingly, it found that the search of the jeans violated the fourth amendment.

¶ 12   The State moved for reconsideration, arguing that the case was controlled by *People v. Hillsman*, 362 Ill. App. 3d 623 (2005), in which the appellate court held that police officers were permitted to take the clothing of Hillsman, a shooting victim being treated in a hospital emergency room, because they were in a legally permitted place and Hillsman's bloody clothing, which was in their plain view, was evidence of a crime (Hillsman's shooting). The trial court granted reconsideration and reversed its previous ruling, finding that the facts of *Hillsman* were like those of the present case.

¶ 13   Thereafter, Pearson moved for reconsideration, arguing that, unlike a regular emergency room, the trauma room he had been in was not accessible to the public and that his expectation of privacy there was reasonable. He cited *People v. Gill*, 2018 IL App (3d) 150594, in which the appellate court held that the defendant had a reasonable expectation of privacy in his hospital room, and thus the police were not permitted to enter without a warrant or consent and seize the defendant's clothing. Pearson also filed a stipulation by the parties regarding the trauma room in which the search of Pearson's jeans took place. The trauma room was located in the emergency

area of the hospital, which was separated by locked doors from a waiting area. Anyone entering the secured area had to be "buzzed in" by staff. The trauma room had a single bed (occupied by Pearson at the time of the search), four walls, and a door. The door was kept closed while Pearson was in the room, except for the entry and exit of hospital personnel. Voyles, the evidence technician, returned to the hospital on a later date to photograph and diagram the trauma room, but hospital staff would not allow him to enter to do so. Pearson argued that this evidence showed that the trauma room was more like the hospital room in *Gill* than the emergency room in *Hillsman* and *Torres*, and thus his expectation of privacy in the trauma room was reasonable. Following briefing and argument, the trial court declined to reconsider its ruling denying suppression of the drugs found in Pearson's pockets.

¶ 14    The case proceeded to a stipulated bench trial. Pearson was found guilty of possession of a controlled substance and sentenced to three years in prison.

¶ 15                              II. ANALYSIS

¶ 16    On appeal, Pearson argues that the trial court erred in denying his motion to suppress because he had a reasonable expectation of privacy in both his hospital trauma room and his clothing, and thus the searches violated the fourth amendment. In reviewing the correctness of a trial court's decision regarding the suppression of evidence, we defer to its findings of fact unless they are against the manifest weight of the evidence. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). "However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. [Citation.] Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed." *Id.*

¶ 17              A. General Principles of Fourth Amendment Jurisprudence

¶ 18    "The fourth amendment to the United States Constitution protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' "  *Id.* at 513 (quoting U.S. Const., amend. IV).   To safeguard that right, the fourth amendment provides that warrants to perform searches or seizures must be particular and may only issue upon probable cause.   U.S. Const., amend. IV.   Warrantless searches generally violate the fourth amendment unless they fall within one of a few established exceptions.   *Pitman*, 211 Ill. 2d at 514.

¶ 19    The principle that the police generally must obtain a warrant before seeking to enter or search an area applies even where the police are motivated by a purpose that society recognizes as proper: the investigation of crime.   That is because the rights of personal privacy and freedom from compelled self-incrimination are paramount, as the United States Supreme Court has repeatedly made clear:

> "[T]wo protections emerge from the [Fourth Amendment's] broad constitutional proscription of official invasion.   The first of these is the right to be secure from intrusion into personal privacy, the right to shut the door on officials of the state unless their entry is under proper authority of law.   The second, and intimately related protection, is self-protection: the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual, information which may be used to effect a further deprivation of life or liberty or property.   Thus, evidence of criminal action may not, save in very limited and closely confined situations, be seized without a judicially issued search warrant.   ***   [H]istory makes plain, that it was on the issue of the right to be secure from searches for evidence to be used in criminal prosecutions or for forfeitures that the great battle for fundamental liberty was fought."

(Emphasis added.) *Frank v. Maryland*, 359 U.S. 360, 365 (1959), *overruled on other grounds by Camara v. Municipal Court of the City & County of San Francisco*, 387 U.S. 523, 528 (1967).

¶ 20   Although "the Fourth Amendment protects people, not places" (*Katz v. United States*, 389 U.S. 347, 351 (1967)), "the extent to which the Fourth Amendment protects people may depend upon where those people are" (*Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).   Thus, to assert a claim that the police violated the fourth amendment in conducting a search, a defendant must show that he or she had a reasonable expectation of privacy in the place searched.   *Pitman*, 211 Ill. 2d at 514.   The phrase "reasonable expectation of privacy" does not have a fixed definition that is the same in all circumstances.   Instead, whether a defendant had a reasonable expectation of privacy depends on the facts of each case.   *People v. Johnson*, 114 Ill. 2d 170, 192 (1986).

¶ 21                               B. Reasonable Expectation of Privacy

¶ 22   It is well settled that a search, as that term is used in the fourth amendment, occurs when "the Government obtains information by physically intruding on a constitutionally protected area." *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012).   A search intrudes on a constitutionally protected area when it infringes upon "an expectation of privacy that society is prepared to consider reasonable."   *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).   Misiaszek did not search Pearson's hospital trauma room in the sense of going through its furnishings.   However, if Pearson had a reasonable expectation of privacy in his hospital trauma room, the room was a constitutionally protected area and Misiaszek's entry and visual observation of the room was a search.

¶ 23   The State argues that the search of Pearson's hospital room was valid under the fourth amendment because Pearson had no reasonable expectation of privacy in that room.   Pearson

argues that his expectation of privacy was well-founded and reasonable. The appeal hinges on the outcome of this dispute.[2]

¶ 24    In *Pitman*, our supreme court set out factors to be considered in determining whether a defendant has a reasonable expectation of privacy in the particular area searched:

> "(1) ownership of the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether defendant has a possessory interest in the area or property seized; (4) prior use of the area searched or property seized; (5) the ability to control or exclude others from the use of the property; and (6) whether the defendant himself had a subjective expectation of privacy in the property." *Pitman*, 211 Ill. 2d at 520-21.

The question of "whether a defendant has a reasonable expectation of privacy in the area searched or the items seized must be resolved in view of the totality of the circumstances of the particular case." *Johnson*, 114 Ill. 2d at 192.

___

[2] We note that this is the sole issue presented here; the State did not argue that Pearson consented to Misiaszek's entry into the trauma room. There is no indication in the record that Misiaszek asked Pearson's permission to enter the room or that Pearson invited Misiaszek in. To be valid, consent to search generally must be voluntary, clear, and unequivocal. See *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (the burden of proving that consent to search was voluntary "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *People v. Anthony*, 198 Ill. 2d 194, 202-03 (2001) (a defendant's nonverbal consent to search must be "unmistakably clear").

¶ 25    In addition to the *Pitman* factors, the United States Supreme Court has identified other considerations as potentially relevant.    For instance, the nature of the premises where the search occurred may affect the extent to which it is protected by the fourth amendment.    One's home— an area specifically named in the fourth amendment—is most fiercely defended.    See U.S. Const., amend. IV (protecting the "right of the people to be secure in their *** houses").    "Absent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant."    *Donovan v. Dewey*, 452 U.S. 594, 598 n.6 (1981).    There may be a lesser expectation of privacy in spaces outside of the home, including commercial property, but such areas still enjoy substantial fourth amendment protection.    See *id.* ("these same restrictions pertain when commercial property is searched for contraband or evidence of crime").

¶ 26    In considering the extent to which society is prepared to recognize as reasonable an expectation of privacy in a particular space, the intimate or personal nature of the activities that usually take place in such a space is also relevant.    For instance, despite the fact that a hotel guest may have a relatively fleeting association with, and little or no property interest in, his or her room, a hotel room is protected from police intrusion almost to the same extent as a home.    In *Stoner v. California*, 376 U.S. 483, 490 (1964), the Supreme Court held that, "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, [citation], a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures."

¶ 27    Nor must a commercial space be a "home away from home" to be constitutionally protected.    The Court has long held that employees have a reasonable expectation of privacy in their places of business or personal workspaces.    See *O'Connor v. Ortega*, 480 U.S. 709 (1987); *Mancusi v. DeForte*, 392 U.S. 364 (1968); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).    Semipublic commercial spaces are also protected.    Although police can enter the public

areas of a business " 'in the same manner as a private person' " (*Maryland v. Macon*, 472 U.S. 463, 470 (1985) (quoting *Lewis v. United States*, 385 U.S. 206, 211 (1966))), areas that are *not* open to the general public are shielded from police entry at will.   See *See v. City of Seattle*, 387 U.S. 541, 545 (1967) ("entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled *** within the framework of a warrant procedure"); see also *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) ("[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees.").

¶ 28    And, as noted, an expectation of privacy in highly personal activities may be considered reasonable even in areas where there is public access, so long as care is taken to preserve the private nature of the activities: "A person does not surrender all Fourth Amendment protection by venturing into the public sphere.   To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.' "   *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2217 (2018) (quoting *Katz*, 389 U.S. at 351-52).   For instance, in *Katz*, the Supreme Court found reasonable the defendant's subjective expectation that his conversation in a public telephone booth would remain private.   *Katz*, 389 U.S. at 359.   This principle extends to premises where others may have shared access.   See *Stoner*, 376 U.S. at 489 (guest's knowledge that cleaning staff and repairpersons might enter his hotel room did not invalidate his reasonable expectation that the police would not do so); *Mancusi*, 392 U.S. at 369 (union official who shared an office with others had a reasonable expectation of privacy in the papers he kept there).

¶ 29    How do these considerations apply to a hospital?   "A hospital is, in a sense, *sui generis*." *People v. Brown*, 151 Cal. Rptr. 749, 754 (Cal. Ct. App. 1979).   A hospital typically contains

both public areas, such as hallways and waiting rooms, and private areas, such as patients' rooms. Just as with commercial premises, the limits placed on public access to particular areas in a hospital likewise may restrict the authority of police to enter freely. *See*, 387 U.S. at 545; *Lo-Ji Sales*, 442 U.S. at 329. Further, the fact that a hospital patient has implicitly consented to the intrusion of medical personnel into a private treatment room does not mean that he or she has waived the right to deny others, such as the police, entry:

> "Clearly, although by checking himself into a hospital, a patient may well waive his right of privacy as to hospital personnel, it is obvious that he has not turned 'his' room into a public thoroughfare. \*\*\*
>
> \*\*\* The patient knows and expects that nurses, doctors, food handlers, and others [will] enter and leave 'his' hospital room in accordance with the medical needs of the patient and the hospital routine. On the other hand, a hospital room is clearly not a public hall which anyone in the building is free to use as needed." *Brown*, 151 Cal. Rptr. at 754.

As in *Stoner*, implied consent for some to enter does not equal consent for all to enter. *Stoner*, 376 U.S. at 489.

¶ 30 Moreover, any assessment of expectations of privacy in a hospital must take into account the highly personal nature of the usual activity conducted there—medical treatment—as well as the fact that persons in a hospital may be especially vulnerable: ill or in pain, unclothed or garbed only in a flimsy gown, and often lacking their usual capacity to resist intrusion. Some might argue that this vulnerability should undermine any reasonable expectation of privacy, because many of the usual incidents of personal dignity are already sacrificed to the medical process. We take the opposite view, that under these circumstances society recognizes as reasonable the right of hospital patients to maintain the little privacy that remains to them.

¶ 31                              C. Pearson's Hospital Trauma Room

¶ 32     With all of these considerations in mind, we turn to the issue before us: whether, under the specific facts of this case, Pearson had a reasonable expectation of privacy in the hospital trauma room where he was being treated.    We begin with the *Pitman* factors.    In applying them, we take note of the cogent analysis in *Gill*, 2018 IL App (3d) 150594, of privacy interests in a similar hospital room.

¶ 33     The defendant in *Gill* arrived at a hospital and was put in a single-occupancy room on the seventh floor.    The police came to the hospital to investigate, believing that the defendant might have been involved in a suspicious house fire that occurred a few hours earlier.    At the request of the police, and without the defendant's consent, a nurse took the defendant's clothing from his hospital room and gave it to the police.    *Id.* ¶¶ 5-8.    A police dog sniffed the clothing and alerted, and the defendant was arrested and charged with aggravated arson.    He moved unsuccessfully to suppress the seizure of his clothing as the fruit of an unreasonable search.    *Id.* ¶ 15.    He was later convicted.    *Id.* ¶ 54.

¶ 34     On appeal, the reviewing court reversed.    Applying the *Pitman* factors, it concluded that the trial court erred in finding that the defendant had no reasonable expectation of privacy in his hospital room:

          "In this case, the factors cut in both directions ***.    Defendant, of course, had no

          ownership interest or possessory interest in the hospital room.    It is unclear how long

          defendant was in the room, with possibilities ranging from 8 hours to 15 minutes.

          Defendant was in the room legitimately, and likely maintained at least some ability to

          exclude others from the room.    [Citation.]    Regarding the subjective expectation of

          privacy, our supreme court has explained that a 'defendant need not have taken affirmative

steps to proclaim his expectation of privacy. \*\*\* A defendant simply must outwardly behave as a typical occupant of the space in which the defendant claims an interest, avoiding anything that might publicly undermine his or her expectation of privacy.' *Pitman*, 211 Ill. 2d at 522. By this standard, it must be concluded that defendant maintained a subjective expectation of privacy." *Id.* ¶ 85.

¶ 35 In reaching this conclusion, the reviewing court noted that the defendant "was in a single-occupancy hospital room with a door" on the seventh floor of the hospital (*id.* ¶ 86) and that, while the defendant might not have been able to restrict access to the seventh floor generally,

"he likely enjoyed some rights regarding visitation in his private hospital room. That is, while doctors and nurses [could] come and go from his room to provide care, his room was not open to the public in general" (Emphasis omitted.) (*id.* ¶ 93).

The reviewing court stated that the existence of a door that could be closed, in itself, "implied a certain layer of privacy." *Id.* ¶ 94. Further, the defendant had "at all times acted in a manner typical of an occupant of that space, thus demonstrating a subjective expectation of privacy." *Id.* Finally, given that the concerns of privacy and confidentiality were paramount in a hospital setting and that the importance of protecting those concerns had been recognized through the enactment of laws such as the Health Insurance Portability and Accountability Act (HIPAA) (42 U.S.C. § 1320d-6 (2012); 45 C.F.R. § 160 *et seq.* (2007)) and the physician-patient privilege in Illinois (735 ILCS 5/8-802 (West 2016)), *Gill* held that the defendant's subjective expectation of privacy while being treated in a hospital room was one that "society is prepared to consider reasonable." *Jacobsen*, 466 U.S. at 113.

¶ 36 Many of the facts on which the *Gill* court relied are also present here. Like the defendant in *Gill*, Pearson had no ownership or possessory interest (first and third *Pitman* factors) in the

trauma room he occupied. However, the United States Supreme Court instructs that "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook County*, 506 U.S. 56, 64 (1992); see also *Stoner*, 376 U.S. at 490; *Katz*, 389 U.S. at 352. As for the second factor, Pearson was "legitimately present" in the room as a patient being treated by hospital personnel. The fourth factor, prior use of the area searched, does not have a clear-cut application, as the record does not establish exactly how long Pearson had been in the room before Misiaszek entered; it was at least long enough for hospital personnel to have removed his clothing and to have begun treating his wounds.

¶ 37 As for the fifth factor, there is no indication that Pearson had any less ability to exclude others from the room than the defendant in *Gill*. The trauma room Pearson occupied was behind locked doors in an area of the hospital not open to the general public. In fact, when Voyles returned to photograph and diagram the trauma room where the search occurred, the hospital staff would not allow him to enter. Thus, the record clearly contains evidence that the police, like the general public, did not have free access to the area where Pearson's room was located. Finally, Pearson did not take any public actions or otherwise do anything to undermine his expectation of privacy (*Pitman*, 211 Ill. 2d at 522), and indeed the State acknowledges for the purposes of this appeal that he had a subjective expectation of privacy.

¶ 38 The key is whether Pearson's subjective expectation of privacy in his hospital trauma room was reasonable. We believe that it was. The concern for patients' personal bodily privacy and vulnerability discussed earlier gave rise to the laws protecting the privacy and confidentiality of medical treatment highlighted in *Gill*. Those same laws were in effect at the time of the events here, supporting a similar conclusion that Pearson's expectation of privacy was one that "society is prepared to consider reasonable." *Jacobsen*, 466 U.S. at 113.

¶ 39    The State argues that *Gill* is distinguishable because there the defendant was in a private room on the seventh floor of the hospital.    Attempting to contrast the facts in this case, the State asserts that Pearson was in the "emergency room," a location where, the State argues, he could not hope to exercise control or exclude others.    This is a mischaracterization of the record, however. Pearson was not in an open emergency room; he was in a separate enclosed trauma room with four walls and a door.    The fact that the trauma room was located within the emergency area of the hospital does not necessarily dictate that Pearson's expectation of privacy was less reasonable than that of the defendant in *Gill*.    Indeed, although the hospital room in *Gill* was on the seventh floor, it does not appear that entry to the floor was restricted in any way.    By contrast, in this case, the emergency area in Rockford Memorial Hospital was behind locked doors.    Thus, there was quite possibly *less* public access to Pearson's trauma room than to the defendant's room in *Gill*.

¶ 40    The State argues that Pearson could not have a reasonable expectation of privacy in an area where entry was controlled by others, but our supreme court long ago rejected that argument.    In *People v. Bankhead*, 27 Ill. 2d 18 (1963), a case involving the search of a hotel room after a janitor unlocked the room and allowed the police to enter, the Illinois Supreme Court stated:

> "[T]he People rationalize that defendant was only a guest at the hotel, that a guest of the hotel has only the right to use the premises subject to the landlord's control and right of access to them ***.    We see little in this logic ***.    Whatever rights a hotel has with respect to control and access to a room does not include the authority to admit strangers without legal process, and most certainly does not invest the landlord with the power to waive the constitutional rights of a guest."    *Id.* at 22-23.

The court concluded that, as the "defendant was lawfully on the premises," he was "entitled to the constitutional protection against unreasonable search."    *Id.* at 23.    Although *Bankhead* involved

a hotel rather than a hospital, both are commercial spaces with public and nonpublic areas, and the right of the police to enter at will into the nonpublic areas is restricted in both. Like the defendant in *Bankhead*, Pearson was "lawfully on the premises" of the hospital, and he was entitled to the same protection against unreasonable search as the defendant in *Bankhead*.

¶ 41    As we have emphasized, the determination of whether there is a reasonable expectation of privacy must be made on a case-by-case basis, taking into account the totality of the circumstances. *Johnson*, 114 Ill. 2d at 192. We thus do not hold that all hospital patients, wherever in the hospital they may be found, have a reasonable expectation of privacy in the space around them. We simply hold that, under the circumstances presented here, Pearson had a reasonable expectation of privacy in the trauma room, and thus Misiaszek's entry into the room without a warrant or consent violated the fourth amendment.

¶ 42    The State argues vigorously against this conclusion on a variety of grounds. It first notes that Rockford Memorial Hospital is a public hospital, and it argues that there can be no reasonable expectation of privacy in a public hospital, because choosing to be treated at a public hospital "instantly negate[s]" any privacy interest. The State has not offered any legal authority in support of this argument and thus has forfeited it. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. Further, the case law on this point is to the contrary. See *O'Connor*, 480 U.S. at 718 (a physician who was a state employee had a reasonable expectation of privacy in his desk and files in an office within a public hospital).

¶ 43    The State next asserts that Misiaszek's presence in the trauma room was "mandated by state law," that is, by section 3.2 of the Criminal Identification Act (Act) (20 ILCS 2630/3.2 (West 2016)). We reject this argument as well.

¶ 44    To determine the intent of a statute, we begin by examining its language, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded its plain and ordinary meaning, and where the language is clear and unambiguous we must apply the statute without resort to further aids of statutory construction. *In re Michael D.*, 2015 IL 119178, ¶ 9. Here, the plain language of section 3.2 provides that medical personnel must "*notify* the local law enforcement agency" whenever someone with a gunshot wound seeks treatment. (Emphasis added.) 20 ILCS 2630/3.2 (West 2016). It does not require medical personnel to do anything else, such as admit the police to any particular area of the facility, and it certainly does not "mandate" that police be allowed to enter patient rooms at will. Even if section 3.2 could be read this broadly, the determination of whether there is a reasonable expectation of privacy in a particular place must be based on the totality of the circumstances, not a blanket rule. *Johnson*, 114 Ill. 2d at 192. And a statute could not grant the police powers beyond the bounds of the fourth amendment—a statute permitting the police to freely enter anyone's home without a warrant would be unconstitutional. Accordingly, we find no merit to the State's argument that section 3.2 of the Act authorized Misiaszek to enter Pearson's room.

¶ 45    On the same basis, we reject the State's argument that the hospital staff's notification to the police that Pearson was a gunshot victim was an implicit request or permission for the police to enter Pearson's hospital room. The State also argues that hospital staff consented to Misiaszek's entry into Pearson's room by "buzzing" him into the hospital's locked emergency area. Even if hospital staff could waive Pearson's reasonable expectation of privacy in the room where he was being treated, however (a proposition that is far from clear; see our discussion of *Bankhead* (*supra* ¶ 40)), the record is silent on the question of how Misiaszek actually gained

access to the locked emergency area in this case. There is no evidence that anyone on the hospital staff in fact intentionally admitted Misiaszek, and the mere fact that he somehow gained access does not establish that the hospital staff consented to his presence in the emergency area, much less to his entry into Pearson's separate room.

¶ 46 The State also relies on two cases that persuaded the trial court to deny Pearson's motion to suppress: *People v. Torres*, 144 Ill. App. 3d 187 (1986), and *Hillsman*, 362 Ill. App. 3d at 633. We find these cases inapposite to the facts of this case.

¶ 47 In *Torres*, the defendant blacked out and was taken to a hospital. Pursuant to section 3.2 of the Act, the hospital notified the police of a possible drug overdose. When the police arrived at the hospital, the defendant was in the emergency room. Entering the emergency room to speak with the defendant, the police saw a plastic bag containing a leafy substance protruding from the defendant's pocket and smelled the odor of burnt cannabis. The police seized the plastic bag and ordered the defendant to empty his pockets. In the defendant's wallet, the police found a packet containing LSD. *Torres*, 144 Ill. App. 3d at 189. The trial court denied the defendant's motion to suppress and the reviewing court affirmed, holding that the seizure of the bag of leafy substance was justified as a plain-view seizure and that the subsequent search of the defendant's person was justified by probable cause and exigent circumstances. *Id.* at 191.

¶ 48 The plain-view exception to the warrant requirement permits the seizure of contraband, instrumentalities, or evidence of a crime if (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be *** viewed," (2) the crime-related nature of the object seized is " 'immediately apparent,' " and (3) the officer has a "lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136-37 (1990). Considering the first of these requirements, the *Torres* court held that the police did not intrude upon a reasonable

expectation of privacy when entering the emergency room because, although that area was "not open to the general public in the sense that anyone may wander through at will," access to the emergency room was controlled by hospital staff and the defendant could not "either permit or deny anyone" access to the emergency room. *Torres*, 144 Ill. App. 3d at 190-91. The court also commented that one "obvious consequence" of section 3.2's notification requirement was that "police officers will begin their investigations at the medical facility." *Id.* at 191. However, the court cautioned that its holding was not "an open invitation for the police to rifle the belongings of emergency-room patients" and did not necessarily validate any further searches, such as of a closed container that was "screened from public scrutiny." *Id.*

¶ 49 *Torres* is distinguishable and of limited relevancy to our analysis for several reasons. First, the physical attributes of the emergency room in *Torres* are not described, and, given the reviewing court's focus on whether the defendant was able to control access to the emergency room as a whole, it does not appear that the defendant occupied any individualized treatment space that was shielded from the rest of the emergency area. As far as *Torres* discloses, the defendant may have been in an open area accessible to anyone who might be in the emergency area, including other patients and their families as well as staff. In our case, by contrast, Pearson was being treated in an enclosed individual room. Although the room was located in the emergency area of the hospital, it was a separate room with four walls and a door. The nature of the space at issue is important, as it affects the extent to which a patient could reasonably hope to exclude the gaze or entry of others besides medical personnel. Thus, the distinction between the undescribed general emergency room in *Torres* and the relatively private trauma room here is legally significant. *Torres*'s reliance on section 3.2 of the Act as overcoming any objection to police entry is also mistaken, as we have explained. Most importantly, the *Torres* court did not conduct

a particularized analysis of the defendant's privacy expectation using the *Pitman* factors and instead simply decided in a generalized fashion that any expectation of privacy in an emergency treatment area was *per se* unreasonable. That was error. See *Johnson*, 114 Ill. 2d at 192.

¶ 50 The other case cited by the State, *Hillsman*, relied upon *Torres*, and it is both factually distinguishable and analytically flawed for the same reasons as *Torres*. We therefore reject the State's argument that these cases should be given decisive weight here.

¶ 51 As we conclude that Pearson demonstrated a reasonable expectation of privacy in his hospital room, Misiaszek's entry and search of that room without a warrant or consent violated the fourth amendment. Accordingly, the trial court erred in denying the motion to suppress. We reverse that denial.

¶ 52 Pearson argues that we must also reverse his conviction and sentence, as the sole evidence on which his conviction was based must be suppressed. *People v. Merriweather*, 261 Ill. App. 3d 1050, 1056 (1994) (reversing the defendant's conviction outright where "the State could not prevail on remand without the evidence we have ordered suppressed"). The State does not argue to the contrary. Accordingly, we reverse Pearson's conviction. In light of this holding, we need not address the parties' arguments regarding the search of Pearson's jeans pockets.

¶ 53 Our holding does not unduly confine police investigations conducted at hospitals. First, of course, every case depends on its facts, and different evidence regarding the characteristics of a particular hospital room may in the future give rise to a different conclusion than the one we reach here. There are many areas of hospitals that permit public access, and in these areas a police officer can come and go like any other person. The police are, of course, free to seek a warrant to seize the clothing of a gunshot victim prior to arriving at the hospital. (We note that the State has never raised the argument that Misiaszek's entry into Pearson's room was justified by exigent

circumstances, so it appears there would have been time to seek a warrant here.)   Or the police can take the simplest approach: knocking on the door of a victim's hospital room and asking if they can come in and speak with the victim.   Any of these alternatives would suffice, and would accord better with the requirements of the fourth amendment than the casual invasion of hospital patients' rooms.

¶ 54                                      III. CONCLUSION

¶ 55    For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed.

¶ 56    Reversed.

---

**No. 2-19-0833**

---

| | |
|---|---|
| **Cite as:** | *People v. Pearson*, 2021 IL App (2d) 190833 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 15-CF-585; the Hon. Ronald J. White, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd and Thomas A. Lilien, of State Appellate Defender's Office, of Elgin (Kathleen Weck, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, Katrina M. Kuhn, and Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel, and Sophie Honeyman, law student), for the People. |

---