NOTICE

Decision filed 10/31/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190329

NOS. 5-19-0329, 5-19-0330 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | Nos. 16-CF-466, 17-CF-104 |
| | ) | |
| CORTEZ TURNER, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court, with opinion.
Justices Cates and Wharton concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant appeals from his convictions of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), conspiracy to commit aggravated discharge of a firearm (*id.* §§ 8-2, 24-1.2(a)(1)), and two counts of perjury (*id.* § 32-2(a)). He argues that the court erred in denying his motion to suppress, because he had a reasonable expectation of privacy in his trauma room located in the emergency department of a hospital. He also contends that his conspiracy conviction and one of his perjury convictions should be vacated. For the reasons below, we affirm the court's denial of defendant's motion to suppress and vacate one of defendant's perjury convictions and the conspiracy to commit aggravated discharge of a firearm conviction.

1

¶ 2                                    I. BACKGROUND

¶ 3     In the early morning of October 24, 2016, a shooting occurred on the 1900 block of Shomaker Drive in Murphysboro, Illinois, which resulted in the death of Detrick Rogers. Defendant sustained a gunshot injury during the incident. At a grand jury proceeding regarding the murder of Rogers, defendant denied knowing how he was shot or who fired the gun. After police discovered evidence implicating defendant in the shooting that resulted in the death of Rogers, the State charged defendant with two counts of perjury (*id.*). Roughly a month later, on April 12, 2017, defendant was also charged, by indictment, with three counts of first degree murder (*id.* § 9-1(a)(1), (2), (3)), one count aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), and conspiracy to commit aggravated discharge of a firearm (*id.* §§ 8-2, 24-1.2(a)(1)), in that defendant, while acting together and in concert with others, discharged a firearm in the direction of Rogers, on October 24, 2016, which resulted in Rogers's death.

¶ 4     Defense counsel filed a motion to suppress clothing, arguing that police violated defendant's fourth amendment right when they—without a warrant, consent, or meeting the plain view doctrine—seized defendant's clothing while defendant was in an emergency department trauma room at St. Joseph Memorial Hospital. Thereafter, the court allowed defendant's counsel to withdraw and appointed new counsel.

¶ 5     New counsel filed another motion to suppress defendant's clothing. The motion alleged that the officers did not have a warrant, defendant did not give consent, the clothing was not in plain view, and the seizure was not incident to arrest.

¶ 6     At the motion to suppress hearing, the emergency room nurse that treated defendant, Janet Womick, testified. She averred that defendant presented to the emergency room at St. Joseph Memorial Hospital with a gunshot wound to his left thigh close to his groin. Immediately after

2

arriving, defendant was taken to a trauma room in the emergency department and triaged. After counsel refreshed Womick's memory with defendant's chart and her notes, she testified that defendant's triage began at 1:44 a.m., and she administered morphine at 3 a.m. and 3:30 a.m. Defendant told Womick that he was outside with his friend trying to find a ride and borrowed someone's phone when he heard shots and dropped to the ground. Defendant also informed her that he realized he was bleeding from his leg when he stood up.

¶ 7    Womick remembered that she bagged defendant's pants and underwear in a clear bag because they were bloody. Womick testified that the presence of blood was apparent when you looked at the bag. She placed the bag and defendant's shirt on the counter to the right of the door. She explained that the room was about 8 feet by 10 feet. The counter abutted the door. The bed, counter, and everything else in the room was observable from the door.

¶ 8    Womick testified that two officers came into the triage room and told defendant that they were going to need his stuff and defendant "was very cooperative with the police." She could not remember the exact exchange but remembered defendant "was extremely cooperative the entire time he was there." When counsel asked if Womick remembered defendant specifically agreeing to the police taking his clothing, she answered, "My documentation says that I do, therefore, I would have to say that I did witness that."

¶ 9    Womick's notes revealed that, at 1:50 a.m., a police detective was speaking with the patient. At 2 a.m., two additional officers arrived, spoke with defendant, and requested to see defendant's clothing, and patient agreed. The note further indicated "tell patient taking clothing patient shakes head in agreement." A note entered at 3:15 a.m. indicated that police bagged and took defendant's clothing and "[patient] and [patient's] family aware that police took custody of clothing shoes/socks sweatshirt, boxer briefs, [and] camo sweat pants." At 3:30 a.m. defendant's

mother was at his bedside when defendant was transferred to another hospital. Police were following defendant to the other medical facility with his clothing bagged as evidence.

¶ 10    On cross-examination, Womick stated that immediately prior to defendant's arrival, she received a call that an ambulance was bringing a gunshot wound victim, and the ambulance was expected to arrive in four to six minutes. When the doors of the hospital opened, she expected an ambulance, but instead, it was defendant. The other victim arrived two minutes after defendant.

¶ 11    Womick stated that hospital personnel are mandated to notify the police when a gunshot victim presents to the hospital. However, they did not call the police because they were notified that the police were already en route. Womick testified that the police did not exhibit any pressure or intimidation. She also believed defendant had no difficulty communicating.

¶ 12    Defense next called Detective Chris Liggett. He averred that he was required to respond to a hospital's call informing him that a gunshot victim presented to the hospital. Upon arriving at the hospital, Detective Liggett met with Detective Corey Etherton, who was already speaking with defendant in the emergency department trauma room. Defendant, Detective Etherton, a nurse, and he were the only people in defendant's room. Defendant told the detectives that he was outside trying to use a telephone, heard some shots, realized he was shot, and had Jacie Marble take him to the hospital.

¶ 13    Detective Liggett described defendant's room as about half the size of a jail cell with one bed, one patient, a bunch of medical equipment, and a kitchen counter with a sink in it that was against the door. He stated that the counter was roughly three feet, or maybe less, from the bed.

¶ 14    While the detectives were asking defendant about the circumstances that resulted in his gunshot wound, Detective Liggett noticed a bag containing bloody pants on a countertop that was behind him. He could not remember the exact conversation but testified that either Detective

4

Etherton or he asked defendant something like "Are these your clothes?", "Do you mind if we have a look?", and "Is it all right if we take these as evidence and see what we can find out from them?" Detective Liggett averred that defendant answered affirmatively to each question. He stated that defendant's only real issue was with his tennis shoes because someone bought them for him, and he was concerned about how quickly he would get his shoes back. Despite his concern, defendant at no point stated they could not take his shoes or any of his other clothing. Detective Liggett could not remember if defendant's mother was in the room at that time but did not believe she was there.

¶ 15 Detective Liggett testified that defendant seemed to communicate effectively, was not confused, and overall cooperated. He stated that defendant was clear when he told him that they could take his clothes and there was no question in his mind that defendant was allowing them to look at his clothes. He averred that they try to always take the clothing from the gunshot victim. He further testified that he did not use any coercive police tactics during his communication with defendant.

¶ 16 Detective Liggett confirmed that he did not write a report, but Detective Etherton did. Counsel refreshed Detective Liggett's memory with Detective Etherton's report, and Detective Liggett testified that there was no indication in the report that the detectives obtained consent to seize defendant's clothing.

¶ 17 The defense's last witness was defendant's mother, Patrice Turner (Patrice). After defendant's aunt informed Patrice that defendant had been shot, she went to the hospital. Upon arriving, Patrice saw officers exiting the emergency room doors. She was not allowed to immediately go back to defendant's room but had to sit in the waiting room for about an hour before she could see defendant. Patrice averred that officers were never in the room while she was

5

there; it was only defendant, a nurse, and her. She stated she was only in defendant's room for 20 to 30 minutes because they were getting ready to transfer him. She did not see any of defendant's clothing in the room and did not remember seeing any bag with defendant's clothing on the countertop.

¶ 18    The State argued that—at this point—defendant failed to make a *prima facie* showing that the seizure of his clothes was illegal, but it called Detective Etherton to testify so the court had a full record. Detective Etherton testified that he responded to a call informing him of a shooting with two victims and went to St. Joseph Memorial Hospital's emergency department. Detective Etherton spoke with defendant in his treatment room. He determined defendant had been shot in the left thigh and asked defendant what led him to be shot. Defendant told Detective Etherton that he was walking around using a phone to find a ride and heard some shots. Defendant further stated that he believed he was shot, and when the shots stopped, he had his friend, Marble, take him to the hospital.

¶ 19    Detective Etherton explained that once you enter the outside exit doors of the hospital, you turn right into the main emergency department, and the emergency department main desk is there. He stated that defendant was in the second or third treatment room on the left beyond the main desk. Detective Etherton described the treatment room as small containing a bed, all kinds of medical equipment, and a counter with a sink to the right of the door.

¶ 20    Detective Etherton testified that he observed clothing on the countertop as soon as he walked in the treatment room. He saw a pair of pants in a clear plastic bag, a shirt, and a pair of shoes. He stated that pants were a camouflage cargo-style and had blood on them. Defendant stated that this clothing was what he wore when he was shot. Detective Etherton could not remember if Detective Liggett or he asked defendant, "Are these your clothes? Do you care if we take a look?",

6

but he knew that defendant responded, "yes, they're my clothes" and "sure", respectively. He recalled that Detective Liggett then asked defendant if they could take his clothing, and defendant indicated yes. Detective Etherton stated that defendant's only concern was about getting his shoes back, but the concern did not rise to a level of defendant stating they could not take the shoes. Defendant was just concerned about when he would get them back. Detective Etherton averred that it was common to collect clothing from gunshot wound victims because it was a valuable source of evidence including DNA and gunshot residue testing.

¶ 21    Detective Etherton testified that defendant appeared to be in pain but was never confused and able to communicate clearly. He estimated that he was there for about 30 to 45 minutes before defendant was transported to another hospital. He also stated that Patrice was not in the room.

¶ 22    Defense counsel argued that there were inconsistencies between the detectives' testimonies and the nurse's notes. He further contended the failure to note consent in the police report was concerning. Counsel further argued that even if consent was given, it was provided after morphine was administered and defendant did not have capacity to consent. Finally, counsel asserted that even if the clothing was in plain sight, the indescribable alleged stain inside of a bag on dark camo cargo pants could not be determined by the detectives.

¶ 23    The State, relying on *People v. Hillsman*, 362 Ill. App. 3d 623 (2005), argued that defendant did not have an expectation of privacy in his patient room because the police were required to be there pursuant to section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2016)). The State also argued that based on all the testimony that the bloody clothing was observable as soon as you walked in the room, the detectives legally took the clothes under the plain view exception to the warrant requirement. The State also argued that there was overt, undisputed evidence that defendant consented to the police taking the clothing and there was no

7

evidence that defendant was administered morphine prior to defendant consenting to the police's request to take his clothing.

¶ 24 On January 26, 2018, the court denied defendant's motion to suppress his clothing. The court found that defendant's clothing was in plain view when law enforcement entered the trauma room, and the officer could view the clothing items upon entry into the room. During this time, defendant was compliant and cooperative. It further found after law enforcement asked for permission to take the clothing, defendant consented. The court held that while hospital staff administered pain medication to defendant, he "did not appear to be under the influence to an extent where his consent was not voluntarily, understandingly and knowingly given."

¶ 25 Following a four-day bench trial, the court found defendant guilty of two counts of first degree murder, aggravated discharge of a firearm, and conspiracy to commit aggravated discharge of a firearm. The third count of first degree murder was abandoned. It also found defendant guilty of both counts of perjury.

¶ 26 On January 18, 2019, defendant moved for a new trial. The motion alleged the court erred in denying his motion to suppress his clothing because defendant did not consent to law enforcement entering and searching his hospital room and exigent circumstance or exceptions did not apply. The motion—relying on *People v. Gill*, 2018 IL App (3d) 150594—argued that defendant had a reasonable expectation of privacy in his hospital room and the State failed to establish an exception to the search warrant requirement. Because law enforcement did not view defendant's clothing until after entering defendant's hospital room, they did not view the evidence from a place where they had a legal justification for being and any alleged consent was invalid.

¶ 27 At the hearing on the motion for a new trial, defense counsel noted that *Gill*—which was filed late in 2018—provided support that defendant had a reasonable expectation of privacy in his

treatment room. He argued that the area was enclosed by four walls, and there was no opportunity for the public to come in. Because the detectives were illegally in the room, the plain view exception to the warrant requirement did not apply where the detectives saw the clothing while illegally present in the room.

¶ 28    The court denied defendant's motion for a new trial. It sentenced defendant to 29 years' imprisonment for first degree murder, 8 years for aggravated discharge of a firearm, 6 years for conspiracy to commit aggravated discharge of a firearm, and 3 years for each perjury conviction. The court ordered the aggravated discharge of firearm sentence to be served consecutively to the murder sentence and the sentences for conspiracy and perjury to run concurrently with the other sentences.

¶ 29    Upon defendant's motion to reconsider, the court reduced his first degree murder sentence to 25 years' imprisonment and his aggravated discharge of a firearm sentence to 5 years. The other sentences remained unchanged. Defendant timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, defendant challenges the court's denial of his motion to suppress his clothing seized in the trauma room of the hospital. He also asserts that his conspiracy conviction and one of his perjury convictions should be vacated. We address each issue in turn.

¶ 32                          A. Motion to Suppress Clothing

¶ 33    "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22. "A defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure." *Id.* "A *prima facie* showing means that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress." *Id.* "If a defendant makes a *prima facie* case, the burden

9

shifts to the State to present evidence to counter the defendant's *prima facie* case." *Id.* "However, the ultimate burden of proof remains with the defendant." *Id.*

¶ 34    A ruling on a motion to suppress involves mixed questions of fact and law. See *People v. Aljohani*, 2022 IL 127037, ¶ 28. We give deference to the trial court's factual findings and reverse those findings only if they are against the manifest weight of the evidence. *Id.* The ultimate determination of suppression, however, is a legal question that we review *de novo*. *Id.*

¶ 35    The fourth amendment of the United States Constitution guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV. Generally, reasonableness under the fourth amendment requires a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275 (2002). However, there are "a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967).

¶ 36    The trial court here relied on two such exceptions—consent and plain view—to determine the seizure of the defendant's clothing was constitutional. Under the consent exception, police may conduct a warrantless search when they obtain voluntary consent from whom the fourth amendment protects. *People v. Hayes*, 2018 IL App (5th) 140223, ¶ 28. Under the plain view doctrine, police may seize evidence of a crime without a warrant when (1) the officer is lawfully located in a place from which the evidence could be plainly viewed, (2) the incriminating character of the evidence is immediately apparent, and (3) the officer has lawful access to the evidence itself. *People v. McCavitt*, 2021 IL 125550, ¶ 111. Important to this case, both exceptions apply only when the police did not violate the fourth amendment in arriving at the place that they obtained consent or viewed the evidence. See *People v. Patrick*, 93 Ill. App. 3d 830, 833 (1981).

¶ 37    On appeal, defendant does not dispute the trial court's determination that, once in the trauma room, defendant provided police voluntary consent to seize his clothing and the bloody

10

clothing was in plain view. Rather, he argues that police violated his fourth amendment right because he had a reasonable expectation of privacy in his trauma room and police failed to secure a warrant to search the room. Because police failed to obtain a warrant, the plain view of the clothes and defendant's consent after police entered the room did not justify the seizure.

¶ 38     We note that defendant did not argue that he had a reasonable expectation of privacy in the trauma room at the suppression hearing and raised it for the first time in his motion for a new trial. Under these circumstances, a defendant is usually subjected to forfeiture of the argument. See *People v. Brengettsy*, 25 Ill. 2d 228, 232 (1962) (an objection to evidence based upon a specific ground cannot be advanced for the first time in a motion for a new trial); *Ono v. Chicago Park District*, 235 Ill. App. 3d 383, 392 (1992). However, "[t]he doctrine of forfeiture applies to the State as well as to the defendant and the State may forfeit an argument that the defendant forfeited an issue by not properly preserving it for review." *People v. Lucas*, 231 Ill. 2d 169, 175 (2008). The State here neither raised a forfeiture argument at the motion for a new trial hearing nor argues forfeiture on appeal.

¶ 39     Moreover, the purpose of the forfeiture is to ensure the trial court has an opportunity to correct any errors prior to appeal. *People v. Denson*, 2014 IL 116231, ¶ 13. Such purpose was achieved here where the State presented its argument regarding this issue at the suppression hearing and reiterated it at the motion for a new trial hearing, defense counsel presented its argument at the motion for a new trial, and the trial court decided the issue on the merits at the motion for new trial hearing. As such, we address the merits of defendant's contentions on appeal.

¶ 40     There are two tracks of fourth amendment jurisprudence that are complementary and overlapping: a property-based approach and a privacy-based approach. *People v. Lindsey*, 2020 IL 124289, ¶ 17. The former is recognized by violations onto a person's property (*id.* (citing *Florida*

11

*v. Jardines*, 569 U.S. 1, 5 (2013))); the latter involves a person's societally recognized privacy (*id.* (citing *Jardines*, 569 U.S. at 12 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.))). Here, given the facts and arguments, our review is limited to the privacy-based approach.

¶ 41    Under the privacy-based approach, the fourth amendment protects a person only to the extent that the person has a subjective expectation of privacy in the area searched that society recognizes as reasonable. *People v. Pitman*, 211 Ill. 2d 502, 514 (2004). "Whether one has a legitimate expectation of privacy in an area searched is measured by an objective standard drawn from common experience." *People v. Rosenberg*, 213 Ill. 2d 69, 78 (2004). The burden of establishing a legitimate expectation of privacy lays with defendant. *Id.*

¶ 42    We resolve whether defendant has a legitimate expectation of privacy in light of the totality of the circumstances of the particular case. *People v. Johnson*, 114 Ill. 2d 170, 192 (1986). There is no bright-line rule. *McCavitt*, 2021 IL 125550, ¶ 60. The Illinois Supreme Court provides guidance by stating that courts should consider whether defendant (1) owned the area searched, (2) was legitimately present in the area, (3) had a possessory interest in the area, (4) used the area before, (5) had the ability to control or exclude others from the area, and (6) had a subjective expectation of privacy in the area. *Johnson*, 114 Ill. 2d at 191-92.

¶ 43    The United States Supreme Court has identified other factors such as " 'the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.' " *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)). While warrantless entry into one's home is the primary evil to which the fourth amendment's language is directed—based on the above factors—the United States Supreme Court has found legitimate expectation of privacy in another's residence for overnight guests

12

(*Minnesota v. Olson*, 495 U.S. 91, 99-100 (1990)), hotel rooms for its occupants (*Stoner v. California*, 376 U.S. 483, 490 (1964)), and employees' workplaces (*O'Connor*, 480 U.S. at 716).

¶ 44 Defendant contends that *Gill*, 2018 IL App (3d) 150594, ¶¶ 93-94, which held a person has a reasonable expectation of privacy in his private, single-occupancy room on the seventh floor of a hospital, is directly on point. *Gill* reasoned that the room had four walls and a door, which alone imply a certain layer of privacy. *Id.* It also explained that the room was likely suitable for longer stays, and defendant likely had some control over visitation. *Id.* The court determined that defendant's subjective expectation of privacy was objectively reasonable based on Illinois laws that regard the importance of privacy and confidentially in a hospital. *Id.* ¶ 94 (citing 735 ILCS 5/8-802 (West 2016) (codifying doctor-patient privilege); 45 C.F.R. § 160 *et seq.* (2007) (Health Insurance Portability and Accountability Act privacy rule)).

¶ 45 *Gill* distinguished itself from *People v. Torres*, 144 Ill. App. 3d 187 (1986), and *Hillsman*, 362 Ill. App. 3d at 633, both of which held there is no reasonable expectation of privacy in hospital emergency rooms. *Torres* and *Hillsman* primarily based their holdings on the fact that Illinois law requires medical personnel to inform authorities of injuries that may result from criminal conduct, concluding that an "obvious consequence of requiring such reports is that police officers will begin their investigations at the medical facility." *Torres*, 144 Ill. App. 3d at 191; *Hillsman*, 362 Ill. App. 3d at 633. *Torres* additionally reasoned that medical personnel control access to the emergency room and there was no evidence indicating defendant had the authority to permit or deny anyone access to the emergency room. *Torres*, 144 Ill. App. 3d at 190-91.

¶ 46 According to *Gill*, emergency rooms (ERs) differ from private rooms in that "ERs are designed for temporary, rather than extended stays." *Gill*, 2018 IL App (3d) 150594, ¶ 92. It further noted that *Torres* and *Hillsman* did not explain the nature of the ERs specific surroundings—*i.e.*,

13

whether the ER was an open floor plan or multiple personal rooms—but stated defendant's single occupancy room with a door located on the seventh floor was "a far cry from an ER." *Id.* ¶¶ 92-93.

¶ 47 The circumstances before us present an intersect of these cases. Like *Torres* and *Hillsman*, the trauma room was located in the emergency department of the hospital. However, like *Gill*, defendant was in a single occupancy room with four walls and a door.

¶ 48 The court in *People v. Pearson*, 2021 IL App (2d) 190833, addressed a situation similar to that found here. In *Pearson*, defendant presented to the emergency room with gunshot wounds to both legs. *Id.* ¶¶ 4-5. He was not suspected of committing any crime at that time. *Id.* ¶ 4. An officer entered the trauma room where defendant was being treated to question him about his gunshot wounds. *Id.* ¶ 6. Knowing the jeans were likely evidence of a crime, one officer inspected them and searched the pockets. *Id.* ¶ 7. The search revealed a bag of a controlled substance, which was the basis for defendant's conviction of possession of a controlled substance. *Id.* ¶¶ 7, 14.

¶ 49 Defendant challenged the search, arguing the officer violated his reasonable expectation of privacy in the trauma room. *Id.* ¶ 13. A stipulation by the parties revealed "[t]he trauma room was located in the emergency area of the hospital, which was separated by locked doors from a waiting area." *Id.* Staff had to buzz in anyone who wanted access to the secured area. *Id.* Staff denied access to the evidence technician who returned to the hospital on a later date to photograph and diagram the trauma room. *Id.* The room had four walls, a single bed, and a door that was kept closed while defendant was in the room except for ingress and egress of hospital personnel. *Id.* The trial court found that defendant did not have a reasonable expectation of privacy in the trauma room. *Id.* ¶¶ 11, 13.

14

¶ 50    The Second District reversed the denial of defendant's motion to suppress. Acknowledging that hospitals contain both public and private areas, it characterized patient rooms as private and noted "limits placed on public access to particular areas in a hospital likewise may restrict the authority of police to enter freely." *Id.* ¶ 29. It stated that a patient's implied consent for hospital staff to enter "does not equal consent for all to enter." *Id.* (citing *Stoner*, 376 U.S. at 489). It also noted that highly personal activities are conducted at hospitals and that patients are often vulnerable. *Id.* ¶ 30. While conceding some might view this vulnerability as undermining any reasonable expectation of privacy, *Pearson* took "the opposite view, that under these circumstances society recognizes as reasonable the right of hospital patients to maintain the little privacy that remains to them." *Id.*

¶ 51    Applying the pertinent factors, *Pearson* determined that defendant did not have ownership or a possessory interest (first and third factors) in the room but that defendant "was 'legitimately present' in the room as a patient being treated by hospital personnel." *Id.* ¶ 36. It also found the fourth factor—prior use of the area—was not clear-cut because the record did not indicate how long defendant had been in the room before police entered it. *Id.*

¶ 52    In regard to the fifth factor, *Pearson* concluded defendant had no less ability to exclude others from the room than that seen in *Gill*, as the trauma room was located behind locked doors in an area not accessible to the public. *Id.* ¶ 37. It determined the fact that an evidence technician was denied access to the trauma room was evidence that the general public did not have free access to the area where Pearson's room was located. *Id.* It determined the hospital room was analogous to a hotel room, and on such basis, concluded hospital staff—like hotel staff—could not waive defendant's fourth amendment protections although hospital staff had some level of control over and access to the room. *Id.* ¶ 40.

15

¶ 53    *Pearson* held that defendant's expectation of privacy in the room was one that society is prepared to consider reasonable based on the laws in effect at the time which protect the privacy and confidentiality of medical treatment. *Id.* ¶ 38. Such laws include the Health Insurance Portability and Accountability Act (HIPAA) (42 U.S.C. § 1320d-6 (2012)) and the physician-patient privilege in Illinois (735 ILCS 5/8-802 (West 2016)). *Pearson*, 2021 IL App (2d) 190833, ¶ 35.

¶ 54    The *Pearson* court rejected the argument that section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2016))—which requires medical personnel to notify the authorities of injuries that may have resulted from criminal conduct—authorizes police presence in the trauma room. *Pearson*, 2021 IL App (2d) 190833, ¶ 44. It explained that section 3.2 only requires notification to authorities, not admitting authorities into any area of the hospital. *Id.* The court further reiterated that—even if section 3.2 could be read so broadly—a reasonable expectation of privacy is based on the totality of circumstances and that a statute cannot grant the police authority beyond what is constitutionally permissible by the fourth amendment. *Id.*

¶ 55    Upon these considerations, *Pearson* found the defendant's trauma room was comparable to that in *Gill* rather than *Torres* and *Hillsman*. *Id.* ¶¶ 49-50. It further noted that *Torres* and *Hillsman* were analytically flawed because—instead of analyzing the appropriate factors to determine whether there was a legitimate expectation of privacy—they generally held any expectation of privacy in an emergency treatment area was *per se* unreasonable. *Id.*

¶ 56    Moreover, *Pearson* explained—although *Torres* failed to describe the physical attributes of the emergency room—*Torres* did not involve an individual "treatment space that was shielded from the rest of the emergency area." *Id.* ¶ 49. The *Pearson* court concluded "the distinction between the undescribed general emergency room *** and the relatively private trauma room ***

16

is legally significant." *Id. Pearson* found the emergency area at issue was behind locked doors and was arguably less accessible to the public than the treatment room in *Gill*. *Id.* ¶ 39.

¶ 57    In considering the above caselaw and legal principles, we do not find defendant had a legitimate expectation of privacy in the trauma room. It is undisputed that the second factor is established. Defendant was legitimately present in the trauma room to seek medical treatment for his gunshot wound. However, none of the other factors support finding a reasonable expectation of privacy. Defendant had neither ownership over (first factor) nor a possessory interest (third factor) in the area. He was in the room about 15 minutes before officers arrived, and there was no evidence that defendant had prior use of the trauma room (fourth factor).

¶ 58    With respect to the fifth factor—ability to control others' access to the area—there is also no evidence to conclude defendant could exclude persons from the area. Defendant's mother testified that she was excluded from the room until hospital staff allowed her to go back. We find this demonstrates the hospital's control over the area, not defendant's. We also find significant that while defendant may invite guests to the room, the hospital would have the controlling authority on whether defendant's invitees were allowed in the room. Without evidence of defendant's authority to include or exclude others from the trauma room, we find this factor does not support a finding of an ability to control others' access to the area required to evidence a legitimate expectation of privacy. See *Rosenberg*, 213 Ill. 2d at 78 ("It is the defendant's burden to establish that he had a legitimate expectation of privacy that was violated by the challenged search.").

¶ 59    We further find no evidence of the sixth factor, defendant's subjective expectation of privacy. There is no indication that defendant wanted the trauma room door closed or that defendant requested to have no visitors. By all accounts, defendant voluntarily spoke to and

cooperated with the officers. The record does not reveal defendant took any steps to proclaim his privacy beyond his presence in the trauma room.

¶ 60    Defendant relies on *Gill*, 2018 IL App (3d) 150594, ¶ 85, to argue that this factor was established based on him acting as a typical occupant of the trauma room. However, to support such contention, *Gill* cited *Pitman*, 211 Ill. 2d at 522, a case distinguishable from the one here.

¶ 61    In *Pitman*, the Illinois Supreme Court determined defendant had a legitimate expectation of privacy in a barn located on a farm owned by his mother. *Id.* The court found defendant had a possessory interest in and the ability to control or exclude others from the barn. *Id.* at 521. Then, quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978), the court explained that " 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude.' " *Pitman*, 211 Ill. 2d at 521-22. In light of this principle, the court found that defendant need not take steps to affirmatively claim a subjective expectation of privacy and only "must outwardly behave as a typical occupant of the space ***, avoiding anything that might publicly undermine his or her expectation of privacy." *Id.* at 522. It held defendant's legitimate presence, possessory rights, and ability to exclude others—alone—was sufficient to establish a legitimate expectation of privacy. *Id.*

¶ 62    *Pitman* does not therefore support the contention that, under every circumstance, a person need only to act as a typical occupant of a space to establish a subjective expectation of privacy in that space. Rather, we read *Pitman* to hold that a person need not take affirmative steps to establish his or her subjective expectation of privacy when such person has a possessory interest in and the ability to exclude others from an area based on the assumption in *Rakas* that one likely has a legitimate privacy interest in an area in which they lawfully possess and control.

18

¶ 63     Defendant here had no possessory interest in the area, and there is no evidence that defendant had the ability to exclude others. It therefore cannot be assumed that defendant likely had a legitimate expectation of privacy in the trauma room, and *Pitman* is inapplicable. See *Lindsey*, 2020 IL 124289, ¶ 42 (although defendant was typical hotel occupant, Illinois Supreme Court found no evidence of subjective expectation of privacy in hotel's alcove).

¶ 64     Looking beyond the factors and at the totality of the circumstances, we do not find the fact that defendant was in a room with four walls and a door bears significant weight in our analysis. We first note that, unlike *Pearson*, there was no evidence as to whether the door of defendant's trauma room was open or closed. Nor was there any evidence that defendant's room was behind a locked door precluding entry of the public.

¶ 65     More importantly, "a structure's boundaries have no significance standing alone." *City of Champaign v. Torres*, 214 Ill. 2d 234, 246 (2005). It is the reason a person is located within a structure or the use of that structure that is the significant consideration. See *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not"); *Torres*, 214 Ill. 2d at 245-46 (a party guest has no reasonable expectation of privacy). Compare *Stoner*, 376 U.S. at 490 ("[n]o less than a tenant of a house, or the occupant of a room in a boarding house [citation], a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures"), with *United States v. Agapito*, 620 F.2d 324, 334 (2d Cir. 1980) (casual visitor of hotel room has no legitimate expectation of privacy in hotel room).

¶ 66     In light of this consideration, we do not find a patient in a trauma room comparable to an overnight guest, hotel occupant, or the patient in *Gill*. Staying overnight in another's home or hotel involves similar attributes of a personal residence, in that it provides safety and security of one's

19

belongings as they sleep. See *Olson*, 495 U.S. at 98-99. An overnight guest "seeks shelter in another's home precisely because it provides him with privacy." *Id.* at 99. On the contrary, a trauma room is a temporary placement where medical staff can assess injuries and provide initial medical care until a more permanent place becomes available or a patient is discharged. See generally *Buchanan v. State*, 432 So. 2d 147, 148 (Fla. Dist. Ct. App. 1983) (defendant "could have expected to remain only a few hours at most [in emergency room]"). Unlike hotels or staying overnight in another's home, "people are constantly coming and going from the [trauma] room to provide medical services." *United States v. Mattox*, 27 F.4th 668, 674 (8th Cir. 2022); *Commonwealth v. Welch*, 167 N.E.3d 1201, 1212 (Mass. 2021); *Matthews v. Commonwealth*, 517 S.E.2d 263, 264 (Va. Ct. App. 1999); *Buchanan*, 432 So. 2d at 148. A trauma room simply does not have the same indicia of a residence. *Mattox*, 27 F.4th at 674 ("Being admitted to the hospital for a gunshot wound does not serve the same valuable societal function [as an overnight guest].").

¶ 67 Defendant here did not seek refuge of the trauma room for an extended period of privacy. Rather, he remained in the room for roughly two hours for initial assessment and care of his injury before being transferred to another hospital. Defendant's transitory presence in the trauma room is insufficient to establish a legitimate expectation of privacy. *People v. Slavin*, 2011 IL App (2d) 100764, ¶ 18; *People v. Brown*, 277 Ill. App. 3d 989, 994-95 (1996); see *Matthews*, 517 S.E.2d at 264 (no reasonable expectation of privacy in emergency department treatment room where defendant was not assigned private room, door to room was open, and his hospital stay lasted five hours).

¶ 68 We also find that neither the laws concerning medical privacy nor the law concerning notification to authorities of injuries that likely resulted from a crime control the outcome here. We agree with *Pearson* that a statute cannot grant police authority beyond that allowed by the

fourth amendment. *E.g.*, *Payton v. New York*, 445 U.S. 573 (1980) (New York statute allowing warrantless enter to a private residence to make felony arrest violated fourth amendment); *Torres v. Puerto Rico*, 442 U.S. 465 (1979) (Puerto Rico statute allowing police to search the luggage of any person arriving in Puerto Rico from the United States violated fourth amendment). However, a statute also does not determine the reach of the fourth amendment protections. *California v. Greenwood*, 486 U.S. 35, 43-44 (1988). The inquiry is whether—considering the totality of the circumstances—society accepts the expectation of privacy as reasonable. *Rosenberg*, 213 Ill. 2d at 78.

¶ 69    Although not determinative, we acknowledge that laws are one source to analyze in determining what expectations of privacy society accepts as reasonable. See *United States v. Miller*, 425 U.S. 435, 442-43 (1976); see generally *Tennessee v. Garner*, 471 U.S. 1, 15-16 (1985) (considered the rules of individual jurisdictions to determine reasonableness of police procedures under the fourth amendment). Laws express public policy. *American Access Casualty Co. v. Reyes*, 2012 IL App (2d) 120296, ¶ 8, *aff'd*, 2013 IL 115601, ¶ 8. In construing laws, we strive to give effect to the intent of the legislature and view the law in light of other relevant statutory provisions. *McDonald v. Symphony Bronzeville Park, LLC*, 2022 IL 126511, ¶ 17. We therefore find—in determining society's view of reasonableness—viewing all statutes relevant to disclosure of medical as a whole embodies the public policy of this State.

¶ 70    HIPAA and the patient-doctor privilege indicate significant privacy interests in medical care; however, several exceptions to HIPAA and the patient-doctor privilege allow for the disclosure of protected medical information. See 45 C.F.R. § 164.512 (2016) (listing exceptions to the nondisclosure of private medical information under HIPAA); 735 ILCS 5/8-802 (West 2016) (listing 14 exceptions to the physician-patient privilege). These exceptions include, among others,

21

reporting of suspected child abuse or neglect (325 ILCS 5/4(a)(1), (g) (West 2016)), suspected abuse or neglect of persons over 60 years old living in a non-licensed facility or adults with disabilities (320 ILCS 20/4 (West 2016)), when a person poses a clear danger to himself or others (430 ILCS 65/8.1(d) (West 2016)), and that in this case—an injury likely resulting from criminal activity (*People v. Kucharski*, 346 Ill. App. 3d 655, 660 (2004); see 20 ILCS 2630/3.2 (West 2016); 45 C.F.R. § 164.512(f)(1)(i) (2016)). Adhering to a common principle of statutory construction, these more specific exceptions control over the general provisions of the physician-patient privilege. *E.g.*, *Kucharski*, 346 Ill. App. 3d at 660; see *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 31 ("[I]t is a commonplace of statutory construction that when two conflicting statutes cover the same subject, the specific governs the general." (Internal quotation marks omitted.)). In our view, these exceptions support a diminished expectation of privacy in medical information. *Mattox*, 27 F.4th at 674 (law requiring reporting of gunshot wounds diminishes privacy interest in medical care).

¶ 71   Considering the totality of the circumstances of this case, we conclude defendant did not establish a legitimate expectation of privacy in his trauma room. Federal caselaw and opinions from several of our sister states support this conclusion. See *id.* (defendant had no reasonable expectation of privacy in hospital room); *Welch*, 167 N.E.3d at 1212 (defendant had no reasonable expectation of privacy in ICU room); *State v. Rheaume*, 2005 VT 106, ¶ 10, 889 A.2d 711 (defendant had no reasonable expectation of privacy in hospital's emergency treatment room); *Matthews*, 517 S.E.2d at 264 (same); *State v. Thompson*, 585 N.W.2d 905, 911 (Wis. Ct. App. 1998) (defendant had no reasonable expectation of privacy in emergency room or surgery room); *Wagner v. Hedrick*, 383 S.E.2d 286, 291-92 (W. Va. 1989) (defendant had no reasonable expectation of privacy in a curtained off area of an emergency room); *Buchanan*, 432 So. 2d at

22

148 (same); *State v. Cromb*, 185 P.3d 1120, 1126-27 (Or. Ct. App. 2008) (same); *State v. Lomax*, 852 N.W.2d 502, 506-07 (Iowa Ct. App. 2014) (defendant had no reasonable expectation of privacy in emergency room). Accordingly, the court did not err in denying defendant' s motion to suppress.

¶ 72                                    B. Inchoate Offense

¶ 73    Next, defendant contends, and the State concedes, that his conviction for conspiracy to commit aggravated discharge of a firearm must be vacated. Section 8-5 of the Criminal Code of 2012 provides, "[n]o person shall be convicted of both the inchoate and the principal offense." 720 ILCS 5/8-5 (West 2016). "[A] judgment of conviction and sentence may be entered on either the inchoate *or* the principal offense, but not both." (Emphasis in original.) *People v. Gomez*, 286 Ill. App. 3d 232, 235 (1997).

¶ 74    Defendant here was convicted and sentenced for aggravated discharge of a firearm and conspiracy to commit aggravated discharge of a firearm, both of which stemmed from the shooting that resulted in the death of Detrick Rogers. Conspiracy is an inchoate offense. *People v. Allen*, 221 Ill. App. 3d 737, 741 (1991); see also *People v. Johnson*, 250 Ill. App. 3d 887, 905 (1993). Accordingly, we vacate defendant's conviction and sentence of conspiracy to commit aggravated discharge of a firearm. See *Johnson*, 250 Ill. App. 3d at 905 ("Where a defendant has been convicted of both the principal and inchoate offenses, the proper procedure is to vacate the conviction and sentences with respect to the inchoate offenses.").

¶ 75                                    C. Perjury Conviction

¶ 76    Lastly, defendant argues that one of his perjury convictions should be vacated because both perjury charges were grounded in the same material issue—how defendant was shot on October 24, 2016. Defendant's argument invokes the one-act, one-crime doctrine in that his two separate

23

untruthful statements made in one proceeding and concerning the same material issue do not constitute two separate acts to which the State can charge perjury. Defendant forfeited this issue by failing to raise it in a postsentencing hearing motion. However, because an alleged violation of the one-act, one-crime doctrine presents the risk of a surplus conviction and sentence, such violation satisfies second-prong plain error. *People v. Schaefer*, 2020 IL App (5th) 180461, ¶ 24. We will therefore address it.

¶ 77    Under the one-act, one-crime doctrine, a defendant cannot be convicted for multiple offenses that are based on the same physical act. *Id.* ¶ 25. An "act" is "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). "Two separate acts *** do not become one common act solely by virtue of being proximate in time." *People v. Coats*, 2018 IL 121926, ¶ 26. To determine whether an overt manifestation supported multiple counts of the same offense, we must determine the legislative intent behind the perjury statute and whether the evidence supports multiple violations of the statute. *Id.* ¶ 24. We review issues concerning statutory interpretation and whether a conviction must be vacated under the one-act, one-crime doctrine *de novo*. *People v. Ward*, 326 Ill. App. 3d 897, 902 (2002); *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

¶ 78    We find *People v. Guppy*, 30 Ill. App. 3d 489 (1975), provides a sound analysis of the Illinois perjury statute. The Criminal Code of 2012 defines perjury as: "A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law the oath or affirmation is required, he or she makes a false statement, material to the issue or point in question, knowing the statement is false." 720 ILCS 5/32-2(a) (West 2016).

¶ 79    In *Guppy*, the court found the statute's reference to " 'a false statement, material to the issue or point in question' " significant. *Guppy*, 30 Ill. App. 3d at 492. The Third District found

24

this language "plainly means that each false statement concerning a different issue or point under inquiry is a separate perjurious act and hence a separate offense." *Id.* Relying on federal and New York caselaw, the court agreed that the State should not be allowed to charge multiple perjury counts where a defendant may have repeatedly lied but in response to repeated questions or a single inquiry that the State fractured into multiple questions. *Id.* at 493-94. It held that separate counts of perjury are "proper to the extent that each count alleged a false statement in answer to a question concerning a different fact or point in question." *Id.* at 494-95.

¶ 80    Here, it is undisputed that both counts of perjury concerned questions regarding how defendant was shot on October 24, 2016. The first count of perjury was based on the following exchange at the grand jury proceeding:

> "[PROSECUTOR]: Okay? First of all, do you have any idea who shot you?
>
> [DEFENDANT]: No, sir, not at all."

The second count of perjury was based on the following exchange:

> "[PROSECUTOR]: Okay. Tell everybody what you saw.
>
> [DEFENDANT]: All I know is, I'm walking down the street, talking on the phone. I really wasn't paying too much attention to nothing what was going on, 'cause I was trying to log into my Facebook, so I really—my face was basically down here the whole time. I'm just walking up and down the street as I do plenty of nights. *** I'm talking, I mean texting on the phone or whatever. And all I hear is just a whole bunch of gunshots started going off, multiple gunshots. You know, I didn't think too much of it, you know. All I know is I turned, and I just started running, you know. And I ran. And by the time I got to the house, I feel my pants, you know what I'm saying, I feel a leakage coming out from my leg, you know."

25

¶ 81　While there is less than a page redacted between both questions, it is clear that "[t]ell everybody what you saw," the question concerning the second count of perjury, intended to extract an explanation of defendant's general denial of knowing who or what caused his injury, which was the basis of the first count of perjury. Moreover, the indictment asserted the same reason as to why defendant's answers for both counts amounted to perjury, *i.e.*, defendant falsely denied being the source of his own injury when involved in a shooting that resulted in the death of Detrick Rogers. The issue or point in question—defendant's knowledge of how he was shot on October 24, 2016— remained the same. The State concedes both counts were premised on essentially the same question on the same point at issue. Accordingly, we vacate one of defendant's perjury convictions and sentences.

¶ 82　　　　　　　　　　　III. CONCLUSION

¶ 83　The court properly denied defendant's motion to suppress because he did not have a legitimate expectation of privacy in the emergency department trauma room. However, his conviction for conspiracy to commit aggravated discharge of a firearm cannot stand where he was convicted of the principal offense of aggravated discharge of a firearm, and one of defendant's perjury convictions violates the one-act, one-crime doctrine. We therefore vacate one of defendant's perjury convictions and his conspiracy conviction and affirm the remaining judgment.

¶ 84　Affirmed in part and vacated in part.

26

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, Nos. 16-CF-466, 17-CF-104; the Hon. Ralph R. Bloodworth III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Jennifer M. Lassy, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Joseph A. Cervantez, State's Attorney, of Murphysboro (Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |